UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Robert Patrick Lewis et al.

v.                                    Case No. 22-cv-126-PB
                                      Opinion No. 2023 DNH 046
Seth Abramson


MEMORANDUM AND ORDER

Seth Abramson, an attorney and journalist, published a series of

articles and tweets alleging that the 1st Amendment Praetorians ("1AP"), its

founder, Robert Patrick Lewis, and one of its members, Philip Luelsdorff,

were militant extremists involved in the January 6, 2021, attack on the

Capitol. Lewis, Luelsdorff, and 1AP brought a defamation, conspiracy, and

false light invasion of privacy action against Abramson, challenging 41

statements published by Abramson or his alleged co-conspirators. Abramson

now moves to dismiss the complaint in its entirety for failure to state a claim.

For the reasons that follow, I grant Abramson's motion in part and deny it in

part.

I.      BACKGROUND

A.    January 6 Attack on the Capitol

Because the events of January 6, 2021, form the backdrop of this case, I

recount them briefly here as necessary to provide relevant context for the

plaintiffs' claims.

1

Following the 2020 election of Joseph Biden to President of the United States, then-President Trump "refused to concede, claiming that the election was 'rigged' and characterized by 'tremendous voter fraud and irregularities.'" Trump v. Thompson, 20 F.4th 10, 17 (D.C. Cir. 2021) (cleaned up). President Trump retained attorneys Rudy Giuliani and John Eastman to investigate allegations of voter fraud and develop legal strategies to challenge the results of the election. See U.S. Dominion, Inc. v. Fox News Network, LLC, Nos. N21C-03-257 EMD, N21C-11-082 EMD, 2023 WL 2730567, at *5 & n.83 (Del. Super. Ct. Mar. 31, 2023); Eastman v. Thompson, No. 8:22-cv-00099-DOC-DFM, 2022 WL 1407965, at *1-2 (C.D. Cal. Jan. 25, 2022). Leading up to the certification of the election results, Eastman, Giuliani, and other supporters of President Trump convened in a so-called "war room" at the Willard Hotel (the Willard room) to explore legal strategies for "delaying or blocking the certification of the election." See Eastman, 2022 WL 1407965 at *2. Cf. Doc. 16 at 20.

On January 6, 2021, Congress began proceedings to certify the results of the election. See Thompson, 20 F.4th at 17. That same day, President Trump held a rally for his supporters on the Ellipse, where he reiterated his claims of a "stolen" election and urged then-Vice President Pence to reject certain States' electors. See id. at 18. Following the speech at the Ellipse, "a large crowd of President Trump's supporters—including some armed with

weapons and wearing full tactical gear—marched to the Capitol and violently broke into the building to try and prevent Congress's certification of the election results." Id. Law enforcement was unable to contain the crowd, who "scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol." Id.

B.    The Plaintiffs

1AP is an organization that "provide[s] pro bono security and protective services at grassroots events." Doc. 16 at 1. The organization was founded by plaintiff Lewis and includes a number of volunteer members, including Luelsdorff.[1] Id. at 1-2; see also Doc. 20-2 at 4.

Lewis, Luelsdorff, and 1AP were in Washington, D.C., in the days leading up to the certification of the 2020 election results. Doc. 16 at 20, 24. On January 5, 1AP volunteers provided security for an event. Id. at 24. Then, on January 6, 1AP volunteers provided "personal security" for unidentified members of the press. Id. Lewis did not provide security services on January 6, but rather attended President Trump's speech at the Ellipse, then spent the remainder of the day at the Willard Hotel. Id. Luelsdorff was also at the Willard Hotel for some period of time on January 6, although it is unclear whether he was there in a purely personal capacity or to provide security

---

[1]    The complaint denies that Luelsdorff is the "Director of Business Development" for 1AP but does not dispute that he is a member of 1AP. See Doc. 16 at 20.

services through 1AP. See id. at 20. While at the Willard Hotel, Luelsdorff momentarily entered the Willard room, where he was photographed standing near Eastman, Giuliani, and other individuals associated with President Trump. Id. at 20, 30.

## C.   Abramson's Reporting

Abramson is an attorney and journalist who publishes a substack[2] entitled "Proof." Id. at 18. Abramson's substack focuses largely on the Trump presidency and, in particular, the events of January 6. See generally Doc. 20-3 through 20-7.

On June 21, 2021, Abramson posted a substack that discussed the Willard room, its suspected "participants," and its alleged role in the events of January 6. Doc. 20-3 at 6-10. The substack included the picture of Luelsdorff standing in the Willard room near Eastman and Giuliani. Id. at 9. When the substack was first posted, Abramson did not know that the man in the picture was Luelsdorff and referred to him only as "WhiteTee," a "Known But Unidentified Participant[]" in the Willard room. Id. at 7, 9.

---

[2]     Substack is a subscription email newsletter platform "which allows writers to send digital newsletters directly to their readers and monetize their work by putting it behind a paywall[.]" See Fatemi, The Rise of Substack—And What's Behind It, Forbes (Jan. 20, 2021), https://www.forbes.com/sites/falonfatemi/2021/01/20/the-rise-of-substack-and-whats-behind-it/?sh=353c26a4159f; see also Doc. 22 at 4 n.2.

Abramson later posted an "update" to his June 21 substack that identified the man in the picture as Luelsdorff. Id. at 9. He stated that Luelsdorff was "the Director of Business Development for the militant extremist 1st Amendment Praetorian group run by Robert Patrick Lewis." Id. The update linked to another of Abramson's substacks, published on June 30, 2021, entitled "Far-Right Militants Were in Trump's Insurrection Week Command Center." Doc. 20-5 at 2.

The June 30 substack discussed 1AP, Lewis, and Luelsdorff at length. Id. at 2-10. The centerpiece of the substack was an interview with Lewis on a podcast called Patriot Transition Voice, which Abramson linked to in the article. Id. at 3-7. In that interview, recorded the day after the attack on the Capitol, Lewis stated that he had spent the past week with "very well known, very high profile people on the conservative side" and "a lot of very well-known constitutional scholars." Doc. 20-10 at 39, 84; see also Doc. 20-5 at 4. Lewis also expressed his belief that the attack on the Capitol was the work of Antifa; that the election was fraudulent and that China, Pakistan, Venezuela, Russia, and Iran were involved in perpetrating the fraud; and that "culture Marxists" will "ensure they never lose power again unless we have a full blown revolution." Doc. 20-10 at 30, 38, 46, 49.

Quoting from the interview extensively, Abramson asserted that Lewis harbored "extremely dangerous, even seditious views" and labeled 1AP as

"radical militant extremists." Doc. 20-5 at 3, 10. After analyzing several of Lewis's statements in the interview, Abramson concluded that the interview indicated that Lewis was inside the Willard room. Id. at 4-7. Abramson asserted that this, in conjunction with the aforementioned photograph of Luelsdorff in the Willard room, proved that 1AP was involved in the Willard room, which Abramson described as "Team Trump's Insurrection Week command center." Id. at 5, 7-8.

A few weeks later, on July 12, Abramson posted another substack discussing Lewis and 1AP at length. Doc. 20-6 at 2, 8-11. The July 12 substack was a compilation of "January 6 data" that Abramson viewed as important but had not yet written about. Id. at 2. One portion of the substack linked to and discussed an interview with Lewis on a podcast called After Dark with Rob and Andrew. Id. at 8. In that interview, Lewis stated that he had "met with Professor Eastman several times" and "got to hear him talk about . . . ways that we could do things and ways that we could rectify the [election fraud]." Doc. 20-11 at 13. Lewis also stated that he "had a protected detail on General Flynn and Sidney Powell and Patrick Byrne in D.C. from about mid-November through January," and that, as a result, Lewis "was around all those [election fraud] investigations in many ways throughout that time." Id. at 43. Lewis went on to question whether the videos from the attack on the Capitol may have been "staged," asserting that "[a] lot of

Marxists have infiltrated [the country's] Intelligence services" and are "try[ing] to cleanse the United States of people who don't align with them politically." Id. at 24, 31, 34-35.

In analyzing the interview, Abramson emphasized that the interview further confirmed that Lewis and 1AP were involved in the Willard room, and classified some of Lewis's statements on the podcast as "conspiracy theor[ies]." Doc. 20-6 at 9-10. Abramson went on to state: "I believe that a federal judge would—and may yet—order a psychiatric evaluation for [Lewis], who acted as a high-level advisor to Trump's legal team pre-, mid-, and post-insurrection." Id. at 10.

Abramson referenced the plaintiffs, albeit in passing, in at least two other substacks focused on the events of January 6. In one substack, posted on June 28, Abramson stated that 1AP "act[ed] as security for top agents of Team Trump." Doc. 20-4 at 3. In another substack, posted on September 23, Abramson stated that both Luelsdorff and Lewis were inside the Willard room, and that "Lewis had been running a private intelligence operation for Team Trump to try to establish that the 2020 election was stolen by a multinational cabal of pro-communist interests," which Abramson described as a "preposterous" "conspiracy theory." Doc. 20-7 at 4.

Abramson, a relatively prolific Twitter user with a large base of followers, also referenced the plaintiffs in a number of his tweets. See Doc. 16

at 22. The tweets largely focused on the plaintiffs' alleged role in the Willard room and classified the plaintiffs as, among other things, "domestic extremist[s]," "far-right . . . militants," "insurrectionist[s]," "deranged," and "a legitimate danger to national security." See Doc. 20-8 at 2, 15, 18, 36. A number of other Twitter users also posted about the plaintiffs, asserting, for example, that they were part of "Flynn's QAnon militia group" and were "standing by with weapons on Jan. 6th" to "cheer[] on the overthrow of the [United States Government] in real-time." [3] Doc. 16 at 8, 11, 13. According to the plaintiffs, those statements were posted pursuant to a conspiracy led by Abramson to defame the plaintiffs. Id. at 14-16.

As a result of the damaging statements published by Abramson and his co-conspirators, the plaintiffs suffered significant personal and economic harm. Id. at 17. The plaintiffs were subjected to "public scorn, ridicule and contempt," to the point that "Luelsdorff's oldest son [considered] changing his name." Id. As a result, Lewis and Luelsdorff have suffered "embarrassment," "mental anguish," and "fear of bodily injury and death." Id. at 32. Moreover,

---

[3]    One of the challenged co-conspirator statements was posted by an individual identified as David Crosse on a website other than Twitter. See Doc. 16 at 12, 14 (Statement 33). Nonetheless, because the vast majority of the co-conspirator statements were posted to Twitter and many of the co-conspirators are identified only by their Twitter accounts, I occasionally refer to the alleged co-conspirators as "other Twitter users" for ease of reference.

Lewis and Luelsdorff have lost clients for their respective businesses, and 1AP has lost donors. Id. at 31-32.

D.    The Complaint

Invoking this court's diversity jurisdiction, the plaintiffs filed a complaint against Abramson alleging defamation (Count I), defamation by implication (Count II), false light invasion of privacy (Count III), and common law conspiracy (Count IV). Id. at 19-37. Each count challenges 41 different statements published by either Abramson or one of his alleged co-conspirators. Id. at 4-14. Abramson now moves to dismiss the complaint in its entirety, arguing that it fails to state a claim under any of the four causes of action.

## II.   STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. On a motion to dismiss, I consider only the allegations in the complaint and any documents incorporated therein, including "the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the

complaint[.]" See Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228
F.3d 24, 32 (1st Cir. 2000) (quoting Shaw v. Dig. Equip. Corp., 82 F.3d 1194,
1220 (1st Cir. 1996)); see also Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.,
524 F.3d 315, 321 (1st Cir. 2008).

In testing a complaint's sufficiency, I employ a two-step approach. See
Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). First, I
screen the complaint for statements that "merely offer legal conclusions
couched as fact or threadbare recitals of the elements of a cause of action." Id.
(cleaned up). A claim consisting of little more than "allegations that merely
parrot the elements of the cause of action" may be dismissed. Id. Second, I
credit as true all of the plaintiff's non-conclusory factual allegations and the
reasonable inferences drawn from those allegations, and then determine if
the claim is plausible. Id. The plausibility requirement "simply calls for
enough fact to raise a reasonable expectation that discovery will reveal
evidence" of illegal conduct. Twombly, 550 U.S. at 556. The "make-or-break
standard" is that those allegations and inferences, "taken as true, must state
a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v.
Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

## III.   ANALYSIS

The plaintiffs' claims arise out of 41 different statements, 28 of which
were made by Abramson on either substack or Twitter, and 13 of which were

made by Abramson's alleged co-conspirators. The plaintiffs argue that
Abramson is liable for conspiracy, defamation, defamation by implication,
and false light invasion of privacy for both his own statements and those of
his co-conspirators.[4] Abramson moves to dismiss all four of the plaintiffs'
claims. Abramson first argues that the plaintiffs have failed to plausibly
allege that he agreed with others to commit a tort, and therefore cannot state
a claim for conspiracy or otherwise hold him liable for the statements of his
alleged co-conspirators. As to his own statements, Abramson argues that the
challenged statements are not actionable under any of the plaintiffs' theories
because they are either constitutionally protected opinions or are
substantially true. Finally, Abramson argues that, even if some of the
statements are actionable, the plaintiffs' defamation claim must nonetheless
be dismissed because they have failed to allege that the statements were
made with actual malice. I consider each argument in turn.[5]

---

[4]     Both parties cite exclusively to New Hampshire common law as the
controlling substantive law. I therefore assume that New Hampshire law
applies without engaging in a choice-of-law analysis. See Hershey v.
Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003).

[5]     Each challenged statement is reproduced in the attached appendix. I
refer to the challenged statements by the numbers assigned to them in the
plaintiffs' complaint. The complaint sometimes quotes from the relevant
publications directly and at other times rephrases statements to support the
plaintiffs' claim that the statements are defamatory by implication. Where
the language quoted in the complaint diverges from the language of the
statement it purports to describe, I credit the language as it appears in the
record. See Clorox Co. P.R., 228 F.3d at 32. For purposes of analysis,

A.      Conspiracy Liability

A civil conspiracy is "a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means." Jay Edwards, Inc. v. Baker, 130 N.H. 41, 47 (1987) (quoting 15A C.J.S. Conspiracy § 1(1), at 596 (1967)). "The elements of a cause of action for civil conspiracy are '(1) two or more persons (including corporations); (2) an object to be accomplished (i.e. an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.'" Sykes v. RBS Citizens, N.A., 2 F. Supp.3d 128, 138 (D.N.H. 2014) (quoting Jay Edwards, Inc., 130 N.H. at 47). "It is a core principle of conspiracy that the activities of each are attributable to all." O'Hara v. City of New York, 568 F. Supp.3d 241, 252 (E.D.N.Y. 2021). Thus, once a conspiracy is established, each conspirator may be held liable for the actions of his co-conspirators in furtherance of the shared conspiracy. See McFarland v. McFarland, 684 F. Supp.2d 1073, 1085 (N.D. Iowa 2010); see also 15A C.J.S. Conspiracy § 18 (2023) (cited favorably in Jay Edwards, Inc., 130 N.H. at 47).

---

however, I will assume that each statement that the complaint rephrases can be read to imply what the plaintiffs claim it implies.

The plaintiffs allege that Abramson conspired with several other Twitter users to defame the plaintiffs, and therefore should be held liable for the defamatory statements made by his co-conspirators.[6] To support their conspiracy claim, the plaintiffs allege that Abramson and his co-conspirators (1) communicated with one another; (2) shared information and "proudly admitted that they were engaged in a 'collaborative effort'" to gather "intel;" and (3) republished or otherwise repeated one another's statements. Doc. 1 at 14. The complaint was later amended to add that, after the plaintiffs filed their initial complaint, at least some of Abramson's co-conspirators "locked down their Twitter accounts and almost overnight ceased publication of <u>any</u> statements of or concerning Plaintiffs," which the plaintiffs claim constitutes "circumstantial evidence of the existence of a conspiracy to defame" them. Doc. 16 at 36 (emphasis in original).

The plaintiffs' allegations do not provide an adequate basis from which to plausibly infer that Abramson and the alleged co-conspirators had an agreement to spread false and damaging information about the plaintiffs. At

---

[6]    In his motion to dismiss, Abramson argues that, pursuant to Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1), he cannot be held liable for "retweeting" content by other users. Doc. 20-1 at 20. At the motion hearing, however, the plaintiffs clarified that they were not claiming that Abramson was liable for "retweeting" the co-conspirators statements, but rather they were seeking to hold Abramson liable for the statements of his co-conspirators pursuant to a theory of conspiracy liability. Accordingly, I need not consider Abramson's argument under the Communications Decency Act.

most, the allegations show that the alleged co-conspirators and Abramson interacted with one another and committed similar torts. But such actions cannot form the basis for conspiracy liability unless they were carried out pursuant to an agreement to commit a tort. See 15A C.J.S. Conspiracy § 12 (2023) ("Without a meeting of the minds, the independent acts of multiple wrongdoers do not amount to a conspiracy."). And here, there are no factual allegations that plausibly support the plaintiffs' assertion of a tortious agreement. See Censabella v. Town of Weare, 2017 DNH 181, 2017 WL 3917154, at *6 (D.N.H. 2017) (concluding that a conspiracy claim must be dismissed where there is "nothing in the complaint to support a plausible inference that [the defendant] ever entered into an agreement with anyone else to inflict some wrong against [the plaintiff]").

The plaintiffs argue that the close temporal proximity between the initiation of their suit and the co-conspirators' efforts to "lock[] down their Twitter accounts" supports an inference that they were all participants in a conspiracy. See Doc. 16 at 36. While the timing of the co-conspirators' actions may support an inference that the plaintiffs' suit spurred the "lock down," it is a bridge too far to claim that the "lock down" supports te plaintiffs' conspiracy claim. Rather, it seems far more likely that those Twitter users ceased their actions, not because they had conspired with Abramson, but because the suit alleged that their statements were defamatory and they

feared for their own liability. See Iqbal, 556 U.S. at 680 (noting that

allegations of behavior "consistent with an unlawful agreement . . . d[o] not

plausibly suggest an illicit accord" where it is "more likely explained by[]

lawful . . . behavior").

Accordingly, the plaintiffs have failed to plausibly allege the existence

of a conspiracy, and Count IV must be dismissed. Without a properly pled

conspiracy, Abramson cannot be held liable for the statements of others.

Therefore, the remaining claims must also be dismissed to the extent they

challenge statements made by others.[7]

---

[7]     Statements 3, 7, 15, 21, 22, 23, 27, 28, 30, 31, 32, 33, 36. See Doc. 16 at 4-14. The complaint alleges that Statement 3 was published by another Twitter user and repeated by Abramson in his June 30 substack. Id. at 4. The challenged statement does not appear in the June 30 substack provided to the court, and therefore I do not credit the allegation that Abramson repeated the statement. See Clorox Co. P.R., 228 F.3d at 32. The record does show, however, that Abramson provided a link to the challenged tweet in his substack. To the extent the plaintiffs claim that Abramson is liable for hyperlinking to the tweet, this argument is foreclosed by New Hampshire's "single publication rule," which prohibits independent actions based on the subsequent dissemination of a publication. See Keeton v. Hustler Magazine, Inc., 131 N.H. 6, 11 (1988). "Although the republication exception to the single publication rule provides that any future republication of the alleged false statements could form the basis for a new cause of action against the republisher, it appears that the majority of courts that have squarely addressed whether a hyperlink constitutes republication have concluded that it does not." See Landino v. Mass. Teachers Ass'n, No. 20-cv-11392-DJC, 2022 WL 3214993, at *5 n.2 (D. Mass. Aug. 9, 2022) (cleaned up); see also Lokhova v. Halper, 995 F.3d 134, 142 (4th Cir. 2021) ("persuasive case law suggests, although creating hypertext links to previously published statements may technically direct audiences' attention to the prior dissemination of those statements, such links do not constitute republication.") (cleaned up); Brimelow v. N.Y. Times Co., No. 20 civ. 222 (KPF), 2020 WL 7405261, at *7

B.    Defamation, Defamation by Implication, and False Light

I next consider whether the statements published by Abramson state a claim under the plaintiffs' remaining theories. I begin by outlining the elements of each cause of action before turning to Abramson's arguments that the statements are nonactionable because they either are constitutionally protected statements of opinion or are substantially true.

1.    Elements

To state a claim for defamation, a plaintiff must allege that the defendant "publish[ed] a false and defamatory statement of fact about the plaintiff[] to a third party." See Boyle v. Dwyer, 172 N.H. 548, 553 (2019) (cleaned up). Because falsity is a required element, a statement is not actionable if it is "substantially true," meaning "the gist or sting of the remark" is justified notwithstanding any minor inaccuracies. See Thomas v. Tel. Publ'g Co., 155 N.H. 314, 335 (2007) (quoting Faigin v. Kelly, 978 F. Supp. 420, 425 (D.N.H. 1997)). A statement is defamatory if it exposes the plaintiff "to contempt, hatred, scorn or ridicule, or tend[s] to impair [the plaintiff's] standing in the community." See id. at 338. On a motion to dismiss, the court is charged with determining "whether the language in question could reasonably have been read to defame the plaintiff." See

_____

(S.D.N.Y. Dec. 16, 2020) ("Courts have concluded that merely hyperlinking to an existing publication does not . . . give rise to liability."). The plaintiffs do not present an argument as to why I should conclude otherwise.

Duchesnaye v. Munro Enters., Inc., 125 N.H. 244, 252-253 (1984). In making this determination, "a court must read the statement 'in the context of the publication taken as a whole.'" Collins v. Univ. of N.H., 746 F. Supp.2d 358, 373 (D.N.H. 2010) (quoting Duchesnaye, 125 N.H. at 249).

Defamation by implication is a particular theory of defamation whereby a defendant may be held liable for making a statement that, while literally true, is presented in a way that conveys a false and defamatory implication. See Howard v. Antilla, 191 F.R.D. 39, 44 & n.6 (D.N.H. 1999); see also Duchesnaye, 125 N.H. at 250 (recognizing that a defamation claim could be premised on a defamatory implication). For example, courts have recognized a cause of action for defamation by implication where "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts." See Jews For Jesus, Inc. v. Rapp, 997 So.2d 1098, 1108 (Fla. 2008); Stevens v. Iowa Newspapers, Inc., 728 N.W.2d 823, 827 (Iowa 2007); see also Smolla, Law of Defamation § 4:16 (2d ed. 2023) (collecting cases). Where a claim is based on a defamatory inference, that "inference, once defined, is treated like a claim for direct defamation and is subject to the same constitutional guardrails." See Cheng v. Neumann, 51 F.4th 438, 444 (1st Cir. 2022).

Whereas "private plaintiffs can succeed in defamation actions on a state-set standard of proof (typically, negligence) . . . the Constitution

imposes a higher hurdle for public figures[.]" See Pendleton v. City of
Haverhill, 156 F.3d 57, 66 (1st Cir. 1998). Public figures cannot recover in
defamation actions unless they demonstrate that the defendant made the
challenged statements with "'actual malice'—that is, with knowledge that it
was false or with reckless disregard of whether it was false or not." See N.Y.
Times Co. v. Sullivan, 376 U.S. 254, 280 (1964). The Supreme Court
recognizes two kinds of public figures: general-purpose and limited-purpose.
See Trotter v. Jack Anderson Enters., Inc., 818 F.2d 431, 433 (5th Cir. 1987).
A general-purpose public figure is marked by "general fame or notoriety in
the community, and pervasive involvement in the affairs of society[.]" Gertz
v. Robert Welch, Inc., 418 U.S. 323, 352 (1974). A limited-purpose public
figure is someone who may not be known in general, but has "thrust
themselves to the forefront of particular public controversies in order to
influence the resolution of the issues involved." Id. at 345. Whether an
individual is a private or public figure presents a question of law for the
court's determination. See Pendleton, 156 F.3d at 68.

     "The New Hampshire Supreme Court has never explicitly recognized
the viability of a claim for false light." Howard v. Antilla, 294 F.3d 244, 248
(1st Cir. 2002). Nonetheless, "[t]his court has predicted that New Hampshire
law would apply the elements of the tort which are provided in the

Restatement (Second) of Torts § 652 (1977), as have other jurisdictions."[8]

O'Neill v. Valley Reg'l Health Care, Inc., 2001 DNH 054, 2001 WL 276968, at *2 (D.N.H. 2001); see, e.g., Wentworth-Douglass Hosp. v. Young & Novis Prof'l Ass'n, 2011 DNH 020, 2011 WL 446739, at *6 (D.N.H. 2011); Philbrick v. eNom, Inc., 593 F. Supp.2d 352, 381 (D.N.H. 2009); Douglas v. Pratt, 2000 DNH 199, 2000 WL 1513712, at *5 (D.N.H. 2000). Under § 652E of the Restatement (Second) of Torts, a defendant is liable for false light invasion of privacy if (1) the defendant "gives publicity to a matter concerning [the plaintiff] that places [the plaintiff] before the public in a false light," (2) that false light "would be highly offensive to a reasonable person," and (3) the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."[9] "[I]t is essential . . . that the matter published concerning the

---

[8]    Abramson cites to Mansfield v. Arsenault, No. 2020-0100, 2021 WL 72370 (N.H. Jan. 8, 2021) and Thomas, 151 N.H. at 440, for the proposition that New Hampshire does not recognize false light invasion of privacy as a cause of action. In those cases, however, the New Hampshire Supreme Court merely declined to consider whether the tort is recognized in the state, without foreclosing the possibility. See Mansfield, 2021 WL 72370 at *2; Thomas, 151 N.H. at 440. Abramson does not provide any argument as to why I should abandon this court's consistent position that the New Hampshire Supreme Court would recognize a cause of action for false light invasion of privacy.

[9]    Although the Restatement appears to require proof of actual malice in all cases, the authors included a "Caveat," which notes that "[t]he Institute takes no position" on whether recovery may be obtained based on a showing of mere negligence. See Restatement (Second) of Torts § 652E. This

plaintiff is not true." Id. at cmt. A. Thus, "the false light tort parallels the

substantial truth rules that govern defamation." Smolla, Law of Defamation §

10:23 (2d ed. 2023).

### 2. Actionability of Statements

Abramson argues that the challenged statements are not actionable

under any of the plaintiffs' theories because they either constitute

---

formulation is based on Time, Inc. v. Hill, 385 U.S. 374, 387-388 (1967),
where the Supreme Court held that the Constitution required plaintiffs in a
false light action to "pro[ve] that the defendant published the [statement]
with knowledge of its falsity or in reckless disregard of the truth." The
continuing viability of Hill, however, has been called into question following
Gertz, where the Court concluded that the Constitution requires proof of
actual malice in defamation actions only where the plaintiff is a public figure.
See 418 U.S. at 347; see also Restatement (Second) of Torts § 652E cmt. D
(discussing the effect of Gertz on the holding in Hill). Given this uncertain
landscape, some courts have required proof of actual malice in all false light
actions, see, e.g., Goodrich v. Waterbury Republican-American, Inc., 448 A.2d
1317, 1330 (Conn. 1982); McCall v. Courier-Journal & Louisville Times Co.,
623 S.W.2d 882, 888 (Ky. 1981); whereas others have held that proof of
negligence is sufficient where the plaintiff is a private figure, see, e.g., West
v. Media Gen. Convergence, Inc., 53 S.W.3d 640, 647 (Tenn. 2001); Crump v.
Beckley Newspapers, Inc., 320 S.E.2d 70, 89 (W. Va. 1983). I need not resolve
the necessary standard of proof at the present time because it has not been
raised by the parties. Both parties discuss actual malice only with regards to
the defamation claims, and seem to assume that proof of actual malice is not
required if the plaintiffs are private figures. See Doc. 20-1 at 16-18; Doc. 22 at
17-18. Indeed, while Abramson's motion to dismiss could be read to argue
that the false light claim should be dismissed for failure to plead actual
malice if the plaintiffs are public figures, it does not assert that the same
result follows even if the plaintiffs are private figures. See Doc. 20-1 at 22.
Accordingly, I express no opinion on whether the plaintiffs must prove actual
malice in order to sustain their false light claim if it is determined that the
plaintiffs are private figures.

constitutionally protected opinions or are not adequately alleged to be false. I consider each of Abramson's arguments in turn.

### a.   Constitutionally Protected Opinions

Although actions for defamation and false light are primarily governed by state tort law, "[t]he Supreme Court has recognized 'constitutional limits on the type of speech which may be the subject of state [tort] actions.'" Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015) (quoting Milkovich v. Lorain Journal Co., 497 U.S. 1, 16 (1990) (emphasis in original)); see also Weyrich v. New Republic, Inc., 235 F.3d 617, 627 (D.C. Cir. 2001) ("Though invasion of privacy false light is distinct from the tort of defamation, the same First Amendment protections apply."). Of principal importance here is the First Amendment's protection for speech that offers an opinion but does not declare or imply provably false facts. See Gray v. St. Martins Press Inc., 221 F.3d 243, 248 (1st Cir. 2000).

The extent of the First Amendment's protection for statements of opinion was first examined by the Supreme Court in Milkovich, 497 U.S. at 10. In that case, the Supreme Court considered whether an editorial article that accused the plaintiff of perjury was nonactionable under the First Amendment because it was framed as the author's opinion. Id. at 3. In holding that the article was actionable, the Court rejected the argument that the First Amendment provides a "wholesale defamation exemption for

anything that might be labeled 'opinion.'" Id. at 18. Afterall, the Court observed, a statement couched as an opinion may imply the existence of underlying defamatory facts, thereby inflicting just as much damage as unqualified assertions of facts. See id. at 18-19. Accordingly, the Constitution makes no distinction between the statements "Jones is a liar" and "In my opinion Jones is a liar," both of which equally imply that the speaker possesses "knowledge of facts which lead to the conclusion that Jones told an untruth." Id. Importantly, however, the Court clarified that the First Amendment does protect statements which "cannot reasonably be interpreted as stating actual facts about an individual." Id. at 20 (cleaned up). Therefore, statements that constitute mere "rhetorical hyperbole" or are otherwise not "sufficiently factual to be susceptible of being proved true or false" cannot form the basis for tort liability. See id. at 20-21. In sum, the relevant inquiry is not whether the challenged statement is one of "fact" or "opinion," but rather whether the statement declares or implies the existence of damaging facts. See id.

Not long after Milkovich was decided, the First Circuit examined its reach in Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724 (1st Cir. 1992). In that case, a theatre company sued a newspaper for a series of articles that accused the company of engaging in deliberately deceptive marketing. Id. at 725. The First Circuit ultimately concluded that the

challenged statements were protected by the First Amendment because the author fully disclosed the facts upon which his accusations were based, thus making clear that he was offering only his "personal conclusion about the information presented" rather than stating objective facts. Id. at 730. In so holding, the court acknowledged that Milkovich did not directly address the actionability of opinions based only on disclosed facts, but nonetheless concluded that the Supreme Court's holding that "a challenged statement must be understood as stating actual facts about an individual . . . unquestionably excludes from defamation liability . . . statements clearly recognizable as pure opinion because their factual premises are revealed." Id. at 731 n.13.

Since Phantom Touring, the First Circuit has consistently held that a "speaker can immunize his statement from [tort] liability by fully disclosing the non-defamatory facts on which his opinion is based."[10] See Piccone, 785

---

[10]    The same is true as a matter of state tort law. The New Hampshire Supreme Court has held that an action for defamation requires "that the challenged statement be one 'of fact,'" meaning it must be objectively verifiable. Automated Transactions v. Am. Bankers Ass'n, 172 N.H. 528, 532-533 (2019) (quoting Pierson v. Hubbard, 147 N.H. 760, 763 (2002)). And, because an action for false light invasion of privacy requires that the challenged assertion be provably false, assertions that are non-falsifiable are necessarily nonactionable. Cf. Hamberger v. Eastman, 106 N.H. 107, 111 (1964). Accordingly, "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts," the statement cannot be considered an assertion of fact and therefore cannot form the basis for liability. See Automated Transactions, 172 N.H. at 534 (quoting Riley v. Harr, 292 F.3d

F.3d at 772; see, e.g., Cheng, 51 F.4th at 447; McKee v. Cosby, 874 F.3d 54, 63 (1st Cir. 2017); Yohe v. Nugent, 321 F.3d 35, 41 (1st Cir. 2003); see also Veilleux v. Nat'l Broad. Co., 206 F.3d 92, 134 (1st Cir. 2000) (noting that constitutional limitations on defamation actions apply equally to false light actions). In such a case, the statement is clearly "a subjective view, an interpretation, a theory, conjecture, or surmise" and not an assertion of objectively verifiable fact. See Gray, 221 F.3d at 248 (quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993)); see also Partington v. Bugliosi, 56 F.3d 1147, 1156 (9th Cir. 1995) (concluding that statements are protected when, "read in context, they are not statements implying the assertion of objective facts but are instead interpretations of the facts available to both the writer and the reader").

First Amendment protections for a speaker's interpretation of disclosed facts play an essential role in fostering the sort of "free expression and interchange of ideas that the First Amendment is designed to promote." See Geary v. Renne, 880 F.2d 1062, 1081 (9th Cir. 1989). As the Supreme Court has recognized, "right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." Sullivan, 376 U.S. at 270 (quoting United States v. Associated Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). In this way, the freedom of speech

---

282, 289 (1st Cir. 2002)).

guaranteed by the First Amendment "is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 503-504 (1984). Immunizing a speaker's interpretation of disclosed facts furthers this quest for truth by protecting a speaker who wishes to offer one interpretation while enabling others to voice contrary conclusions. See McKee, 874 F.3d at 61.

This "latitude for interpretation" is of paramount importance where "a writer is evaluating or giving an account of inherently ambiguous materials or subject matter" that is susceptible to a multitude of interpretations. See Moldea v. N.Y. Times Co., 22 F.3d 310, 315 (D.C. Cir. 1994); see also Partington, 56 F.3d at 1154 ("When, as here, an author writing about a controversial occurrence fairly describes the general events involved and offers his personal perspective about some of its ambiguities and disputed facts, his statements should generally be protected by the First Amendment."). Without such latitude, "the robust debate among people with different viewpoints that is a vital part of our democracy would surely be hampered." Partington, 56 F.3d at 1154.

To this end, courts must take special care to impose liability only for those statements that, viewed in context, "reasonably would be understood to declare or imply provable assertions of fact," and not those statements that

simply offer one of several possible interpretations of disclosed facts. See
Piccone, 785 F.3d at 771 (quoting Phantom Touring, 953 F.2d at 727). This is
a question of law that the court must consider in reference to "the totality of
the circumstances in which the specific challenged statements were made,
including the general tenor and context of the conversation and any
cautionary terms used by the person publishing the statement." Id. at 772.

For this reason, it is important to note the general nature of
Abramson's substack and Twitter, large portions of which have been
incorporated by reference into the plaintiffs' complaint and reproduced in the
record. Abramson describes his work as "curatorial journalism," through
which he compiles and analyzes public sources in order to shed light on
important political matters. See Doc. 20-1 at 4; see also What I Told the
Washington Post About the Suspension of Donald Trump from Twitter at 4;
January 5 "War Council" Attendee Corey Lewandowski Had a Meeting With
Donald Trump on January 5th, and It May Well Have Been at Trump
International Hotel at 2; January 5 War Council at Trump International May
Have Had More Attendees Than Previously Known at 12 (all conventionally
filed per Doc. 24-1). Based on my review of dozens of Abramson's substack
articles and tweets, this description seems fitting. Most of Abramson's
content incorporates or links to a myriad of photographs, interviews, or social
media posts, the vast majority of which appear to derive from public sources.

Abramson analyzes this information to offer various theories about President Trump, prominent Republicans (as in the party), and the events of January 6, all while explaining how his curated sources support his conclusions. All told, it is apparent that the principal purpose—and, indeed, commercial value—of Abramson's work is to compile and analyze publicly available sources in an attempt to offer answers to hotly debated questions of public concern, not to merely state objective facts that have already been definitively established.

The plaintiffs do not appear to dispute this general characterization of Abramson's publications, but they nonetheless argue that the context of Abramson's statements about them would lead his readers to believe that he is offering only objective facts. To support their argument, the plaintiffs point out that Abramson named his substack "Proof" and made frequent reference to "source[s]" and "evidence" without qualifying his assertions as opinions. Doc. 22 at 16. The plaintiffs also note that Abramson touted the fact that he is an "attorney," thereby bolstering his authority and credibility in the minds of readers. Id.

As an initial matter, that Abramson did not qualify his statements is not determinative, since "the law does not force writers to clumsily begin each and every sentence with language such as 'I think,' or 'in my opinion,' for a statement to constitute an opinion." Automated Transactions, 172 N.H. at 546 (cleaned up). Moreover, given the greater context of Abramson's

publications, references to "Proof," "evidence," and the like appear to refer to the facts Abramson gathers in order to reach his ultimate conclusions, not his conclusions themselves. And Abramson's representation that he is an attorney conveys to the reader, not that he possesses undisclosed facts, but rather that he interprets the disclosed facts through a particular lens that his readers may find valuable. With this context in mind, I turn to each of the challenged statements.

Many of the challenged statements accuse one or more of the plaintiffs of being "radical," "militant," "dangerous," or "extremists." In Cheng, 51 F.4th at 446, the First Circuit concluded that similar statements classifying the plaintiff in that case as "[r]ight-wing," "far-right," and a "conspiracy theorist" were the sort of "rhetorical hyperbole" that are nonfactual and therefore protected by the First Amendment. Like the statements in Cheng, the challenged assertions here are the sort of "vague, judgement-based terms that admit of numerous interpretations and are not objectively provable as false." See id. (cleaned up); see also Nat'l Rifle Ass'n v. Cuomo, 350 F. Supp.3d 94, 133 (N.D.N.Y. 2018) (finding that the defendant's "statement that '[the plaintiff] is an extremist organization' is clearly an expression of his opinion"). Nor do these statements, viewed in context, imply the existence of underlying facts, given that the terms are inherently subjective and value laden. See Automated Transactions, 172 N.H. at 533-534 (quoting Levinsky's,

Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 129 (1st Cir. 1997)) ("'The vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be' verifiable and hence actionable."). Accordingly, such statements are constitutionally protected and hence nonactionable.[11]

To be sure, many of the challenged statements go beyond opining on the plaintiffs' viewpoints and could be read to either imply or directly allege that the plaintiffs played a role in the January 6 attack on the Capitol. I do not doubt that, as the plaintiffs assert, such allegations are capable of defaming the plaintiffs if they are assertions of verifiable facts rather than opinions based only on disclosed facts. Nonetheless, many of these allegations are not actionable because they are opinions based on fully disclosed facts that were either directly discussed or linked to in the relevant publication, and are therefore protected by the First Amendment.

Most of Abramson's substacks go to great lengths to outline the relevant facts and walk the reader through how those facts support

---

[11]    Statements 2 (to the extent it accuses the plaintiffs of being "militant extremist[s]"), 8 (to the extent it accuses Lewis of having "extremely dangerous" views), 9 (to the extent it accuses plaintiffs of being "radical, dangerous, [and] militant"), 12 (to the extent it accuses the plaintiffs of being "militant[s]"), 13 (to the extent it classifies the plaintiffs as "radical militant extremists"), 18 (to the extent it refers to Lewis as a "militant extremist" that is "a legitimate danger to national security"), 25 (to the extent it refers to Lewis as a "domestic extremist[]"), 26 (to the extent it classifies Luelsdorff as a "domestic extremist"), 29 (to the extent it accuses 1AP of being a "paramilitary extremist group"). See Doc. 16 at 4-14.

Abramson's ultimate conclusions. For example, in his June 30 substack, Abramson directly accuses the plaintiffs of being involved in the January 6 insurrection. Doc. 20-5 at 5-10. Abramson bases his accusations on (1) the photograph of Luelsdorff in the Willard room, which is prominently displayed in the substack, and (2) statements made by Lewis in a podcast interview, which is linked to and extensively quoted in the substack. Id. at 2-3, 7. Abramson asserts that the photograph of Luelsdorff and Lewis' interview prove that the plaintiffs were involved in the Willard room, then concludes by explaining why he views 1AP's proximity to President Trump as alarming in light of the views Lewis expressed in the podcast. See id. at 7, 9-10. By carefully detailing the facts on which his statements were based, Abramson signaled to the reader that the statements were simply his interpretation of disclosed facts. See Partington, 56 F.3d at 1156 ("because the bases for the conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related") (cleaned up). The same is true of Abramson's July 12 substack, which quotes from and analyzes another of Lewis' interviews to conclude that he is a mentally unstable insurrectionist. See Doc. 20-6 at 9-11 (Statement 20). Accordingly, the opinions contained in these articles are nonactionable.[12]

---

[12]    Statements 8, 9, 11, 12, 13, 14, 20. See Doc. 16 at 4-14.

In some of his other publications, Abramson does not explain his reasoning in significant detail, but nonetheless states the facts underlying his conclusion. For example, in one tweet, Abramson states that the House January 6 Committee should "focus" on individuals who "take[] the 5th" during Committee proceedings, then notes that Lewis is one of several "Trumpworld witnesses taking the 5th—meaning they think if they answer questions honestly they may incriminate themselves[.]" Doc. 20-8 at 54 (Statement 41). This statement could be understood to imply that Lewis was involved in some sort of criminal activity related to January 6. Nonetheless, Abramson discloses the facts behind any such implication by (1) stating that Lewis invoked his Fifth Amendment rights and (2) outlining his understanding of when individuals may invoke their Fifth Amendment rights. See id. Accordingly, Abramson is not signaling that he possesses secret information about Lewis' criminal activities, but rather drawing conclusions from the undisputed fact that Lewis invoked his Fifth Amendment right to remain silent in response to inquiries from the January 6 committee.

Similarly, the June 21 substack, when it was initially posted, prominently displayed a picture of Luelsdorff and referred to him as a "known but unidentified participant" in the Willard room. Doc. 20-3 at 9 (Statement 2). Given that Abramson argues in the substack that the Willard

room was a "command center" for "the January 6 insurrection," this assertion could be understood to imply that Luelsdorff had some involvement in the insurrection. See id. at 2-3. But this assertion is purely based on (1) the photograph of Luelsdorff in the Willard room, which the plaintiffs admit is authentic, and (2) Abramson's belief that the other individuals in the photograph were involved in the insurrection, which he supports with links to other substack articles that outline the factual bases supporting this belief. Because the context of the article makes clear that this is the only information Abramson has on the then-unidentified "participant," no reasonable reader would understand the statement to imply the existence of undisclosed facts.

Other times, Abramson did not explicitly identify the facts underlying his conclusion, but nonetheless sufficiently disclosed them by providing links to his source material. In Cheng, the First Circuit found that an author had sufficiently immunized his statements by linking to the source material that supported his assertions, thus making clear that the statements were simply interpretations of the facts disclosed in the links. See 51 F.4th at 447 (finding that statements were "not actionable because the Article provides a link to the source material, which, in the context of the Article, enables readers to draw their own conclusions 'based on facts accessible to everyone.'") (quoting McKee, 874 F.3d at 63). This is in line with other courts that have similarly

concluded that providing a link can supply the factual disclosure necessary to
confer constitutional protection. See, e.g., Rehak Creative Servs., Inc. v. Witt,
404 S.W.3d 716, 732 (Tex. App. 2013) (finding that "linked documents are
part of the context that must be taken into consideration" and distinguishing
providing links from cases where the speaker "referenced documents that
supposedly supported allegations . . . but did not make those documents
accessible"); Sandals Resorts Int'l v. Google, Inc., 86 A.D.3d 32, 45 (N.Y. App.
Div. 2011) ("Far from suggesting that the writer knows certain facts that his
or her audience does not know, the e-mail is supported by links to the writer's
sources."); see also Kelley & Zansberg, 140 Characters of Defamation: The
Developing Law of Social Media Libel, 18 J. of Internet L. 1, 13 (2014) ("Since
the early years of the Internet, courts have accepted that hyperlinking to the
facts underlying a statement of opinion delivers the required factual
disclosure, allowing the reader to easily evaluate the opinion expressed.").
"Although the process of accessing the factual bases for the opinions
involve[s] clicking onto each Web site, the dispositive point is that th[e]
factual bases [are] disclosed and [are] accessible to the reader." See Franklin
v. Dynamic Details, Inc., 10 Cal. Rptr.3d 429, 439 (Cal. Ct. App. 2004). Thus,
those challenged opinions that provide links to their source material are
constitutionally protected. [13]

---

[13]     Statements 1, 2, 10 (to the extent it implies that the plaintiffs were

For example, three of the challenged statements come from a Twitter thread posted on July 13. See Doc. 20-8 at 15-16 (Statements 17, 18, and 19). The contested statements assert that Lewis is "deranged" or otherwise imply that he is mentally unstable. Id. But the Twitter thread opens with, and repeatedly refers to, a link to Abramson's July 12 substack, where he links to and discusses in detail the podcast interview on which Abramson bases his allegations of mental instability. See id. at 15. Thus, read in the context of the thread in which they appear and the links provided therein, these statements are constitutionally protected interpretations of Lewis' interview.[14]

---

involved in "the planning for the insurrection"), 17, 18, 19, 24, 26, 29 (to the extent it accuses 1AP members of being "insurrectionist[s]" who were "in Trump's war room[] during Insurrection Week"), 35 (to the extent that displaying the photograph of Luelsdorff implies that he or 1AP were involved in the events of January 6), 39 (to the extent that displaying the photograph of Luelsdorff implies that he or 1AP were involved in the events of January 6). See Doc. 16 at 4-14.

[14]    Neither party appears to dispute that tweets should be read in the context of the thread in which they appear. Indeed, courts considering tort actions arising out of Twitter posts regularly rely on other statements in the same thread to provide the necessary context. See, e.g., Lokhova, 995 F.3d at 147; Bauer v. Athletic Media Co., No. CV 22-2062-MWF (AGRx), 2022 WL 18586268, at *15 (C.D. Cal. Dec. 5, 2022); Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am., 551 F. Supp.3d 320, 330 (S.D.N.Y. 2021); Ganske v. Mensch, 480 F. Supp.3d 542, 545-546 (S.D.N.Y. 2020); see also Hunt, Tortious Tweets: A Practical Guide to Applying Traditional Defamation Law to Twibel Claims, 73 La. L. Rev. 559, 597 (2013) ("Just as the statements in the Milkovich publication were considered together, tweets published together must be read in the context of one another[.]")

Another challenged statement comes from the September 23 substack, which explains how a recently released book augments Abramson's past reporting about the Willard room. Doc. 20-7 at 2-3. In the substack, Abramson makes only passing reference to the plaintiffs, asserting that Luelsdorff and Lewis were "inside the Willard Hotel war room" and that Lewis "had been running a private intelligence operation for Team Trump to try to establish that the 2020 election was stolen by a multinational cabal of pro-communist interests[.]" Id. at 4 (Statement 24). Although Abramson does not directly state the facts underlying this assertion, he nonetheless links to the June 30 substack, which explains in great detail how the photograph of Luelsdorff and Lewis' podcast interview indicate that the two were involved in the Willard room. See Doc. 20-5 at 4-8. Additionally, that substack discloses the basis for Abramson's allegations about Lewis' "private intelligence operation" by linking to the podcast interview, where Lewis discusses his role in "digging into" China's involvement in the purported election fraud and his belief that other countries may have been involved as well. See id. at 3, 9; see also Doc. 20-10 at 45-46. Thus, Abramson's assertions could only be understood as his interpretation of the photograph and interview, both of which are disclosed in the linked June 30 substack.

In sum, the majority of Abramson's statements are immune from liability because they are constitutionally protected interpretations of

adequately disclosed facts—most notably, the photograph of Luelsdorff and Lewis' two podcast interviews—none of which are alleged to be false. Abramson's interpretations of these facts are certainly incendiary, and may even be demonstrably wrong, but they are nonetheless constitutionally protected. Accordingly, they cannot form the basis for any of the plaintiffs' claims.

> b.   Falsity

As I explained, under New Hampshire common law, defamation, defamation by implication, and false light each require as an element that the statement's assertion, whether direct or implied, be false. See Gen. Star Indem. Co. v. Beck, 2018 DNH 165, 2018 WL 3849877, at *4 (D.N.H. 2018). Moreover, where, as here, "a plaintiff seeks damages against a media defendant for speech of public concern," the First Amendment requires the plaintiff to prove that the statement is false. See Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986). Therefore, to state a claim under any of their theories, the plaintiffs must "plead facts that, if proven true, would allow a reasonable person to consider the [assertion] false." See Martin v. Mooney, 448 F. Supp.3d 72, 85 (D.N.H. 2020) (collecting cases). An assertion is false if it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." See Masson v. New Yorker

Magazine, Inc., 501 U.S. 496, 517 (1991) (quoting Sack, Libel, Slander, and Related Problems 138 (1980)).

The plaintiffs have not satisfied their burden to plead falsity with regards to two of the challenged statements, both of which touch on subject matter or events not addressed in the plaintiffs' complaint.[15] Statement 40 asserts that Lewis "said he drove Flynn, Powell, and Byrne to the White House the night of December 18, 2020 for what Byrne has described as a covert op[.]" Doc. 20-8 at 46.[16] But nowhere does the complaint address the

---

[15]     The plaintiffs argue that, because they asserted in their complaint that all the challenged statements are "materially false," they have satisfied their burden of pleading falsity. See Doc. 16 at 19. In support of their argument, the plaintiffs cite to Goulmamine v. CVS Pharmacy, Inc., 138 F. Supp.3d 652, 659 (E.D. Va. 2015), which states that, in considering a motion to dismiss, "a court must accept as false any statements which the Complaint alleges to be false." But that case does not stand for the proposition that alleging falsity in conclusory terms is sufficient. Indeed, because the plaintiff in Goulmamine affirmatively pled facts demonstrating the falsity of the challenged statements, that issue was not before the court. See id. at 657. Moreover, Goulmamine supported its statement with a citation to Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993), where the Fourth Circuit recognized that, although a court must "credit the plaintiff's allegation of the factual falsity of a statement," a complaint must do more than merely "couch[] its allegations of falsity in vague, conclusory terms." Thus, the statement in Goulmamine seems to stand only for the uncontroversial notion that, at this stage, a court must accept all well-pleaded facts in a complaint as true. But equally as uncontroversial is the notion that a court need not credit "threadbare recitals of the elements of a cause of action." See Ocasio-Hernández, 640 F.3d at 12 (cleaned up). Accordingly, it is insufficient for the plaintiffs to merely state in a conclusory fashion that the challenged statements are false.

[16]     Statement 40, as it is presented in the complaint, is an amalgamation of at least two different tweets posted several days apart. See Doc. 16 at 14.

falsity of this accusation. Statement 16 accuses Luelsdorff of being "under

criminal investigation or . . . arrested in the past." Id. at 14. The complaint,

however, does not address whether Luelsdorff has been investigated or

arrested, and therefore does not adequately plead that this statement is false.

Because the plaintiffs have not adequately alleged that either statement 40

or statement 16 are false, the plaintiffs' claims for defamation, defamation by

implication, and false light must be dismissed to the extent they are based on

those statements.[17] See Tannerite Sports, LLC v. NBCUniversal News Grp.,

864 F.3d 236, 251-252 (2d Cir. 2017) (dismissing defamation claim where the

plaintiff did not "explain why [the challenged] statements were false" or

"point to any facts in the complaint showing that [the defendant's] claims . . .

_____

The first portion of the statement, pertaining to driving individuals to the
White House, is nonactionable for the reasons discussed above. The second
part of the statement comes from a Twitter thread that states that two
unrelated individuals may have been involved in a "December Conspiracy,"
but neither asserts nor implies that the plaintiffs were involved in that
conspiracy. See Doc. 20-8 at 53-54. Thus, even if the complaint adequately
alleged falsity, that portion of the statement would not be actionable because
it does not defame Lewis or any of the other plaintiffs. See Duchesnaye, 125
N.H. at 252-253 (to be actionable, court must determine that "the language in
question could reasonably have been read to defame the plaintiff"); see also
Restatement (Second) of Torts § 652E.

[17]    To be clear, I make no finding that either statement is true. My
conclusion is based purely on the sufficiency of the allegations in the
complaint, with each non-conclusory allegation accepted as true. See Clark v.
Viacom Int'l Inc., 617 F. App'x 495, 510 (6th Cir. 2015) ("Observing that a
complaint has failed to allege that a statement is false is not the same as
ruling that the statement is objectively true.").

were false"); see also Veilleux, 206 F.3d at 134 ("those statements that we rejected because plaintiffs failed to establish that they were materially false cannot support a false light claim any more than they can a defamation claim.").

c.     Actionable Statements

What remains are a handful of actionable statements that make allegedly false assertions about the plaintiffs without fully disclosing their supporting facts. The statements fall into three broad categories: those that do not provide any links or factual support whatsoever; those that provide only a link to the homepage of Abramson's substack; and those that provide links to sources that do not pertain to the statements' assertions. I discuss each category in turn.

Statement 34, the lone statement in the first category, was posted on Twitter in response to another user's tweet about the Willard room. Doc. 20-8 at 37. The tweet reads:

> There were *many* January 6 war rooms inside the Willard, e.g.:
>
> 1 Trump Legal
> 2 1st Amendment Praetorian/Team Kraken
> 3 Team Stone
> 4 Team Bannon (Stockton/Lawrence)
> 5 March for Trump
>
> And there's evidence of the Proud Boys and Women for America First having a presence there.

Id. Because neither the tweet nor its thread provides any sources or factual support for its assertion, the statement can be read to suggest that 1AP's involvement in a "January 6 war room[]" is itself a verifiable fact.[18] See id.

Abramson argues that he should not be held liable for this tweet because it simply asserts "that 1AP was present in the Willard Hotel on January 6," which the plaintiffs do not allege to be false. Doc. 20-1 at 15. The statement, however, could be understood to assert much more. Rather than merely stating that 1AP was present at the Willard Hotel, the tweet accuses 1AP of having a "war room[] inside the Willard." Doc. 20-8 at 37. The term "war room," as it was regularly used by Abramson and others in the media, imputes involvement in the planning and execution of the events of January 6. See Doc. 20-3 at 2; Doc. 20-14 at 5. Even a reader unfamiliar with this specific use of "war room" could plausibly understand the phrase, when used in reference to January 6, to connote some sort of strategic involvement in the events of that day. Thus, a reasonable reader could understand the tweet to assert that 1AP was involved in coordinating the attack on the Capitol or

---

[18]     The contested statement appears in the record next to another tweet, with the latter linking to Abramson's June 30 substack. See Doc. 20-8 at 37-38. However, it is not clear from the record whether the two tweets were part of the same thread or otherwise related. It could be argued that, if the statement was in a thread that linked to the June 30 substack, this would provide adequate disclosure. But, because I must construe all reasonable inferences from the facts in favor of the plaintiffs, I assume that the link was provided at a different time and in a different thread.

other attempts to overturn the results of the election—an assertion that the plaintiffs vehemently deny. The statement therefore survives the motion to dismiss.

Two of Abramson's statements are actionable because they support their assertions only by providing a link to the homepage of Abramson's substack. Statement 4 appears in a June 26 Twitter thread about the Willard room, and states:

> The Holy Grail is placing dangerous far-right domestic-extremist militants inside Trump's Willard Hotel command center on Insurrection Day. By the end of next week—based on what PROOF will publish and what others are working on—the Grail will have been both found and made public.
>
> Slow and steady is still acceptable for now—despite the ongoing emergency of a domestic insurgency—because PROOF and some talented citizen journalists online are literally six months to a year ahead of major media, the FBI, and Congress re: investigating insurrectionist kingpins.
>
> That said, it must be universally understood that people like Michael Flynn and Sidney Powell and Robert Patrick Lewis and Donald Trump are legitimately dangerous domestic insurgents. Everywhere they go and everywhere they speak, they expand a clear and present danger to America.

Doc. 20-8 at 2.

Classifying Lewis as a "domestic insurgent[]" while discussing the January 6 "domestic insurgency" could plausibly be understood as an assertion that Lewis had some sort of involvement in the January 6 attack on the Capitol. Thus, the statement is capable of defamatory meaning.

The only source Abramson provides to support this assertion is a link to the homepage of his substack, which Abramson argues sufficiently discloses the facts underlying his conclusion. <u>See</u> <u>id.</u> But whether the homepage of Abramson's substack provided adequate disclosure turns on facts not presently available to me at this early stage, such as the appearance of the substack's homepage and the articles featured on it at that time. Based on the materials provided, I cannot determine whether Abramson's substack contained any facts about Lewis at the time this tweet was posted. Indeed, it appears from the present record that the earliest substack post about Lewis was made on June 30—four days after Statement 4 was posted. <u>See</u> Doc. 20-5 at 2 (June 30 substack); <u>see</u> <u>also</u> Doc. 20-3 at 9 (updated June 21 substack with a link to the June 30 substack). In any event, unlike most of his other statements, Abramson's tweet teases that he is in possession of information not available to the reader by stating that the "Holy Grail" will be "made public" in the coming days. Thus, based on the present record, I cannot conclude that the tweet provides the sort of disclosure required to confer constitutional protection.

Statement 25 is actionable for similar reasons. That statement was made in response to another Twitter user who, in discussing the Willard "war room," said that "the term 'war room' is hyperbolic." Doc. 20-8 at 18. Abramson replied:

> This is why sometimes—not always—going straight to the source
> is valuable. I reported that the Willard was a 'war room' because
> two of the participants, domestic extremists Joe Oltmann and
> Robert Patrick Lewis, *called it that* in videos. Now this guy
> implies I devised the term.

Id.

Classifying Lewis as a "participant[]" in the Willard "war room" is capable of defamatory meaning.[19] Lewis denies that he participated in any "war room" or was otherwise involved in the January 6 attack on the Capitol. Doc. 16 at 20, 24. Yet the term "war room," as I have explained, could be understood to impute involvement in the planning and execution of the events of January 6. Thus, a reasonable reader could understand the tweet to falsely assert that Lewis was involved in coordinating an insurrection.

Although Abramson provides a link to his substack homepage later in the Twitter thread, I cannot conclude at the present stage that this link provided the sort of disclosure necessary to confer constitutional protection. To be sure, when this tweet was posted on October 20, 2021, Abramson's substack would have included a handful of articles discussing Lewis' alleged involvement in the Willard room. See, e.g., Doc. 20-5 at 2; Doc. 20-6 at 2. But I cannot determine whether those articles would have been readily available to readers via Abramson's substack homepage, or simply buried amongst

---

[19]    As I explained above, the portion of the tweet that calls Lewis a "domestic extremist" is rhetorical hyperbole and therefore cannot form the basis for liability. See supra note 11; see also Cheng, 51 F.4th at 446.

dozens, if not hundreds, of immaterial substack articles. Because I cannot, at the present stage, determine whether the link to the substack homepage adequately disclosed the facts on which Abramson bases his assertion, I decline to dismiss Statements 4 and 25.

The remaining actionable statements purport to provide direct links to their sources but, because the sources bear no connection to Abramson's assertions, nonetheless could leave the reader with the impression that the assertions are based on undisclosed facts. Cf. Garrett v. Tandy Corp., 295 F.3d 94, 104-105 (1st Cir. 2002); Bourne v. Arruda, 10-cv-393-LM, 2011 WL 2357504, at *4 (D.N.H. June 10, 2011) ("Where, however, an average reader or listener could reasonably understand the statement to be . . . based upon undisclosed facts, 'the issue may properly be left to the jury's determination.'") (quoting Pease v. Tel. Publ'g Co., Inc., 121 N.H. 62, 65 (1981)). In other words, because there is no "logical nexus" between the facts disclosed and the challenged assertions, a reasonable reader could understand the assertions to be statements of objective fact based on undisclosed facts, as opposed to Abramson's interpretations of the facts disclosed. Cf. Yohe, 321 F.3d at 41-42.

For example, Statement 37 is comprised of two tweets, each of which links to and discusses a Mother Jones article. The first tweet states:

> Mother Jones recently reported that a subordinate of Robert
> Patrick Lewis in 1AP (the First Amendment Praetorians),
> Michael Kenny, issued a death threat to a House January 6
> Committee witness that he (Kenny) said was made on behalf of
> 1AP leadership.

Doc. 20-8 at 39-40. A few weeks later, Abramson tweeted:

> If you want to get a better sense of the organization Robert Patrick
> Lewis leads, Mother Jones reported this spring on 1AP allegedly
> threatening to kill a federal witness who had spoken to the House
> January 6 Committee.

Id. at 49.

Although the Mother Jones article discusses the alleged threat and

Kenny's ties to 1AP, it does not assert that Kenny said the threat was "made

on behalf of 1AP leadership." To the contrary, the article states that Kenny

claims he did not threaten the witness. Doc. 20-13 at 3. Nor does the article

report that 1AP, as an organization, was involved in the alleged threat. A

reader therefore could be left with the impression that Abramson has

information about 1AP's involvement in the alleged threat that is not

disclosed in the Mother Jones article, and therefore could understand

Abramson to be making a factual assertion based on undisclosed, defamatory

facts.

Statement 38 is actionable for similar reasons. That statement appears

in a tweet from Abramson, which reads:

> "1AP members don't appear to have stormed the Capitol, but at
> least one operative—Geoffrey Flohr—circled it as the attack was

underway, talking covertly via an earpiece. Another—Philip
Luelsdorff—observed from a war room led by Giuliani and
Eastman."

Doc. 20-8 at 49 (quotation marks in original). The tweet appears to be a

misquote from a third-party article linked in the tweet.[20] Yet neither

Abramson nor the linked article provide any basis for the allegation.[21] The

statement thus could be understood as an assertion of fact rather than an

opinion.

As the plaintiffs allege, this assertion is capable of defamatory

meaning. The plaintiffs allege that Luelsdorff was only in the Willard room

---

[20]    The text from the linked article reads:

The members of the 1st Amendment Praetorian do not appear to have
stormed the Capitol like the Proud Boys and the Oath Keepers, but at
least one of its operatives, Geoffrey Flohr, circled the Capitol as the
attack was underway talking covertly with an earpiece.

While Flohr walked around the Capitol seemingly relaying information,
another member of the 1st Amendment Praetorian, Philip Luelsdorff,
was observing proceedings in the Trump 'war room' led by Giuliani and
then Trump lawyer John Eastman at the Willard hotel.

Doc. 20-14 at 5.

[21]    The record presents the challenged statement next to another tweet
that links to the June 30 substack, although it is unclear from the record
provided whether these tweets appear in the same or different threads. See
Doc. 20-8 at 49-50. Because I must construe all reasonable inferences in favor
of the plaintiffs at this stage, I assume that the two tweets were part of
different threads and therefore do not consider whether the link to the June
30 substack in the latter tweet provides adequate disclosure of underlying
facts. See supra note 18.

for "less than a minute" before he was "immediately asked to leave." Doc. 16 at 20. But stating that Luelsdorff "observed" the attack on the Capitol from the Willard room could be understood to mean that Luelsdorff was in the Willard room for a substantial amount of time. If understood in this way, the statement is capable of defamatory meaning because it associates Luelsdorff with the events of January 6, as well as the allegedly criminal activities of the Willard "war room," and could even be understood to imply support for those events.

Abramson argues that he cannot be held liable for this statement because it is "simply a quote from a Guardian article." Doc. 20-1 at 16. However, "one who repeats . . . defamatory matter is subject to liability as if he had originally published it." See Restatement (Second) of Torts § 578; see also Gray, 221 F.3d at 249-250 (holding a defendant liable for publishing the defamatory statements of a third party). Accordingly, courts have found that a defendant may be liable where he "not only links to previously published material, but also repeats the allegedly defamatory statements." See Brimelow, 2020 WL 7405261 at *7 (collecting cases). Thus, that Abramson was quoting a third-party article does not immunize him from liability.

Statements 5 and 6 both rely on the June 28 substack for factual support. The June 28 substack largely focused on evidence of President Trump's alleged contact with various "insurrectionist leaders" on January 6.

Doc. 20-4 at 2-3. However, Abramson made brief mention of 1AP in the

substack, noting:

> It's become clear, based on emerging evidence produced by [open source intelligence] digital research, that January 6 was coordinated by four entities—the White House, Stop the Steal, InfoWars, and the Proud Boys—with the Oath Keepers running security for Stop the Steal, the 1st Amendment Praetorians (1AP) acting as security for top agents of Team Trump, members of Trump's historically politicized Secret Service acting as liaisons between Team Trump and the insurrectionist and militant groups present in DC in the first week of January, and all of this seditious activity centering around one location in Washington: the Willard InterContinental Hotel near Freedom Plaza.

Id.

Charging 1AP with "seditious activity" goes beyond mere rhetorical

hyperbole, particularly where, as here, it is used in conjunction with the

events of January 6, which many have described as seditious. Thus, read in

context, the tweet could be understood to assert that 1AP was involved in or

otherwise supportive of the attack on the Capitol, and is therefore capable of

defamatory meaning.

Abramson argues that any assertion of "seditious activity" is simply a

statement of opinion based on facts disclosed in the remainder of the June 28

substack.[22] Doc. 20-1 at 10-11. But 1AP is not discussed anywhere else in

---

[22]   Abramson also argues that the plaintiffs have not adequately alleged that the statement is false because they admit that they were providing security on January 6 to unidentified individuals. Doc. 20-1 at 10. Although Abramson is correct that the plaintiffs have not alleged that it is false that they were "acting as security for top agents of Team Trump," that is not the

either the substack or its linked material. Thus, a reasonable reader would not understand Abramson's statement to be a mere interpretation of available facts about 1AP, but rather as a statement of fact based on knowledge that he, but not the reader, possesses. Because Abramson does not provide sufficient factual disclosure for his assertion, his argument that the assertion is simply a matter of protected opinion is unavailing.

Statement 5, which links to the June 28 substack for support, also fails to provide sufficient disclosure for similar reasons. Statement 5 comes from a Twitter thread announcing the release of the June 28 substack. The challenged tweet reads:

> Mountains of evidence—all compiled by PROOF, with full sourcing—now establishes that Insurrection Day was the work of coordination between the White House, Stop the Steal, InfoWars and the Proud Boys, with the Oath Keepers, Three Percenters, QAnoners and 1AP in support roles.

Doc. 20-8 at 4.

This tweet accuses 1AP of playing a "support role[]" in an "[i]nsurrection," and is therefore capable of defamatory meaning. Although the Twitter thread links to the June 28 substack and a few other sources,

---

defamatory portion of the statement. Doc. 20-4 at 2-3. Rather, it is the assertion that the plaintiffs were involved in "seditious activity" that potentially defames the plaintiffs.

none of the links provide facts about 1AP and therefore cannot immunize Abramson's statements.[23]

To summarize, Statements 4, 5, 6, 25, 34, 37, and 38 are each allegedly false assertions of fact that are capable of defamatory meaning, and therefore actionable. Because the plaintiffs' theory is that each of these statements is false, the statements do not support a claim for defamation by implication, which requires a true statement. See Howard, 191 F.R.D. at 44. Thus, there are no actionable statements that support a claim for defamation by implication and that claim (Count II) must be dismissed. The claims for defamation (Count I) and false light (Count III) may proceed as to those actionable statements only.[24]

---

[23]    In addition to the June 28 substack, the thread also links to (1) Abramson's substack homepage and (2) the June 21 substack. Doc. 20-8 at 6-7. As I have explained, the link to the homepage is largely irrelevant at this stage of proceedings given the lack of information about the appearance and substance of the homepage. The link to the June 21 substack is also largely irrelevant. Although that substack was eventually updated to contain more information about 1AP, it appears from the record that this update did not occur until June 30—two days after Statement 5 was posted. See Doc. 20-3 at 9 (providing link to June 30 substack). Thus, when the tweet was posted on June 28, the June 21 substack would not have included any facts about 1AP that a reader could understand as supporting Abramson's statement.

[24]    Abramson also argues that the defamation claims should be dismissed because the plaintiffs are public figures and their complaint fails to "allege sufficient facts to plausibly support a clear and convincing finding of actual malice." Doc. 20-1 at 16. The plaintiffs assert that they are private figures, and therefore need not prove actual malice. Doc. 22 at 18. Whether a plaintiff is a public figure presents a legal question for the court, and therefore may be resolved on the pleadings. See Mandel v. Bos. Phoenix, Inc., 456 F.3d 198,

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion to dismiss (Doc. 20) is granted in part and denied in part. Counts II (defamation by implication) and IV (conspiracy) are dismissed for failure to state a claim. Counts I and III may proceed to the extent they are premised on Statements 4, 5, 6, 25, 34, 37, and 38, as identified in the plaintiffs' complaint (Doc. 16).

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

May 9, 2023

cc:     Counsel of record

---

204 (1st Cir. 2006). Nonetheless, because the public figure determination is "heavily dependent on the underlying factual record," it is often better practice to "demand[] more detailed factual development" where the relevant facts are thin or otherwise inconclusive. See id. at 204, 207. Such is the case here. The complaint alleges that the plaintiffs merely provided neutral security services and did not attempt to influence the events of January 6. See Trotter, 818 F.2d at 433 (stating that, to be considered a public figure, "the plaintiff must have more than a trivial or tangential role in the controversy"). Although documents incorporated into the complaint indicate that Lewis gave two podcast interviews about the events of January 6, it is not clear that this alone would constitute the sort of extensive involvement in a public controversy that would qualify an individual as a public figure. See Gertz, 418 U.S. at 352 (noting that "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation" is an important factor in the public figure determination). Given the limited and highly contested facts available to me at this early stage of the proceedings, I defer my determination of whether the plaintiffs are public figures until there has been further factual development and decline to dismiss the defamation claims on that basis.

Lewis et al. v. Abramson
Case No. 22-cv-126-PB, Opinion No. 2023 DNH 046

APPENDIX[25]

A.   Statements by Alleged Co-Conspirators

| No. | Statement | Source |
|---|---|---|
| 3 | "in ancient Rome, the elite Praetorian Guard kept overthrowing the emperors they were assigned to protect. In DC this January, seems the '1st Amendment Praetorians' had similar ambitions" | Doc. 16 at 4 |
| 7 | "Still don't think 1AP is scary? Read RPL's Tweet from June 28 calling on 'Patriots' to 'take back and keep this Republic' by turning into 'Old Testament, full wrath of God, destruction of their house and salt the earth beneath them Christians.' Hope FBI is watching July 4th" | Doc. 16 at 5 |
| 15 | "Expect to learn more about the son of Russian exile Baroness Rida von Luelsdorff who was in the Willard 'war room' with Giuliani on 1/6, as a representative and member of Flynn's QAnon militia group--1st Amendment Praetorian led by Robert Patrick Lewis :)" | Doc. 16 at 8 |
| 21 | "General Flynn played a significant role in the insurrection operation. 'Flynn Org' was heavily involved in the 'legal/propaganda' part of the op in the months leading up to 1/6 …'Flynn Org' consists of a large cast of high-and low-profile characters Flynn's recruited to achieve his goals. This story will be told w/ a focus on a group recruited in | Doc. 16 at 9 |

---

[25]   Where possible, this appendix displays screenshots of the challenged statements as they appear in the record. I included some of the context surrounding each statement and highlighted the challenged language. See Riley, 292 F.3d at 291 (endorsing the "helpful practice of quoting some of the text surrounding the specific language cited in [the plaintiff's] complaint" and "indicat[ing] in bold" the challenged language). Because the statements by Abramson's alleged co-conspirators are not in the record, I rely solely on the statements as they appear in the complaint. Where the complaint rephrases statements by Abramson, I rely on the statements in the complaint as identifying implications from the relevant publication. See supra note 5. Accordingly, rephrased statements are reproduced here as they appear in the complaint.

| | mid-Nov 2020 to conduct his dirty work: 1st Amendment Praetorian (1AP), led by Robert Patrick Lewis" | |
|---|---|---|
| 22 | "Journalists, media and federal law enforcement need to Investigate [arrow icon] 1st Amendment Praetorian [arrow icon] and their role in the 1/6 insurrection. Who runs 1AP? *Robert Patrick Lewis and *Phillip Luelsdorff" | Doc. 16 at 9 |
| 23 | "John Eastman mapped out a 6 point ([thumbtack icon] 1) path for VP Pence to take to overturn the election, defy the will of the people and overthrow the government. Let's remind ourselves of where John Eastman was on January 6th. And who he was with … 1AP's Luelsdorff" | Doc. 16 at 10 |
| 27 | "Oath Keepers and 1st Amendment Praetorian were standing by with weapons on Jan. 6th. They were coordinating. 1AP takes 'orders' from Mike Flynn. @January6thCmte" | Doc. 16 at 11 |
| 28 | "Someone needs to tell the Oath Keepers, Proud Boys, and 1AP that 'we're not racist' is not a good defense for trespassing, assault, and sedition" | Doc. 16 at 11 |
| 30 | "Combine Raiklin's background/access with that of 1AP's Phillip Luelsdorff whose mom's backstory reads like that of a Russian spy's, and one wonders... Why does Flynn surround himself with so many Russia-friendly operatives?" | Doc. 16 at 11 |
| 31 | "Flynn's militia, 1st Amendment Praetorian, had a member on Giuliani's team (Phillip Luelsdorff)" | Doc. 16 at 12 |
| 32 | "1AP was inside the Capitol. They were hired by Flynn. Oath Keepers were inside the Capitol. They were hired by Roger Stone. Flynn and Stone have deniability. They say, 'I didn't hire them to do THAT'" | Doc. 16 at 12 |
| 33 | "In a tweet telegraphing the attack on the Capitol, the official Twitter account of the 1AP warned on January 4, 2021: 'There may be some young National Guard Captains facing some very, very tough choices in the next 48 hours'" | Doc. 16 at 12 |
| 36 | "1AP … cheered on the overthrow of the USG in realtime on Jan 6th" | Doc. 16 at 13 |

B.    Constitutionally Protected Opinions

| No. | Statement | Source |
|---|---|---|
| 1 | Lewis and 1AP were among "Trump's insurrectionists" | Doc. 16 at 4 |
| 2 | **About the "Known and Unidentified" Participants**<br><br>(8) **"WhiteTee."** He wears a Trump International lanyard and appears in one January 6 Willard war room photo and one January 5-6 Trump International Hotel lobby photo.<br><br><br><br>{UPDATE: *Proof* has now identified the man in the white shirt above as Philip (or sometimes "Phillip") Luelsdorff, the Director of Business Development for the militant extremist 1st Amendment Praetorian group run by Robert Patrick Lewis.} | Doc. 20-3 at 9 |
| 8 | Lewis's claims of high-level access to Trump advisers, members of Trump's legal team, and leading insurrectionists are repeatedly confirmed by photographs of Lewis on January 5 and January 6, in which he can be seen at the January 5 Stop the Steal rally and January 6 Trump Ellipse speech, respectively. The question, however—given the extremely dangerous, even seditious views held by Lewis (see below) and endemic to both his paramilitary and his intelligence-gathering operations—is just how close 1AP got to the command center for insurrectionist plotting on January 5, January 6, January 7, and January 8: the Willard Hotel in DC. And the answer seems to be that 1AP was *anywhere and everywhere it wanted to be* during Insurrection Week, including inside the Willard Hotel suite that Trump lawyer John Eastman has described as a "war room" and Trump legal team adjunct Joe Oltmann has described as a "command center." | Doc. 20-5 at 3 |

| 9 | **So Which War Room Was the 1AP War Room?**<br><br>If the war room Lewis was in on January 7 wasn't in the Willard Hotel, it means rather less to insurrection researchers—as there's nothing particularly remarkable about 1AP setting up a war room in Maryland, Virginia, or DC, much like the Oath Keepers are known to have done by reserving a large block of rooms at a hotel in Virginia. Such an accommodation will most certainly be looked at closely by the FBI, but it may not have any significance to bringing insurrectionist *kingpins* to justice. By comparison, if 1AP had set up camp inside *Donald Trump's Willard Hotel war room*, it would be very hard to imagine a bigger development in the insurrection investigation—as it places radical, dangerous, militant insurrectionists *inside* Team Trump's Insurrection Week command center. So what evidence do we have that Lewis gave his January 7 PTV interview from the Willard, and was referring to the suite of rooms then being used by John Eastman, Joe Oltmann, Rudy Giuliani, Christina Bobb, Russell Ramsland Jr., Robert Hyde, Maria Ryan and up to twenty-five other Trump attorneys, associates, agents, advisers, aides, and allies during the week of the insurrection? Quite a lot. *{Note: Also see the prior Proof reporting on the Willard Hotel war room here, here, here, here, here and here.}* | Doc. 20-5 at 5 |
| 10 | (VS) MAJOR BREAKING NEWS: Far-Right Militants Were in Trump's Insurrection Week Command Center<br><br>With each day, PROOF gets closer—via images, videos, and transcripts—to putting Trump at the heart of the planning for the insurrection. I hope you'll RT this.<br><br><br><br>MAJOR BREAKING NEWS: Far-Right Militants Were in Trump's Insurre…<br>Proof reveals three new participants in Trump's Insurrection Week war room: one a militant, two who helped a Capitol-breaching Stop the Steal insurrectionist broadcast Trump propaganda from January 6…<br>https://sethabramson.substack.com/p/major-breaking-news-far-right-militants | Doc. 20-8 at 8 |

| | | |
|---|---|---|
| 11 | **Lewis´s 1AP Associate Phillip (Philip) Luelsdorff Was Definitely Inside Trump´s Willard Hotel War Room on January 6 and January 7**<br><br>If any doubt remained that 1st Amendment Praetorians were inside the nerve center of Trump's Insurrection Day operation, the picture atop this article dispels it completely.<br><br>The previously unidentified man in the white tee shirt is **Phillip Luelsdorff** (on some documents, **Philip Luelsdorff**), who is the Director of Business Development for the 1st Amendment Praetorians. The Maryland-dwelling Luelsdorff is also a professional poker player (seen in this article discussing the November 2016 Borgata Fall Poker Open at the Borgata Hotel, Casino, & Spa in Atlantic City, New Jersey; the longtime owner of a renovation company (seen in this YouTube video discussing his business); and the former owner of transportation company **Baron Transportation**, during which period of ownership Luelsdorff was arrested in Maryland for "allegedly stealing motor fuel" (Luelsdorff was alleged to have knowingly received the stolen fuel). Here's a clear picture of Luelsdorff playing poker in 2016: | Doc. 20-5 at 7 |
| 12 | **Why 1AP Matters**<br><br>https://sethabramson.substack.com/p/major-breaking-news-far-right-militants?s=r                    ABRAMSON-0038          7/17<br><br>4/27/22, 4:40 PM       Case 1:22-MAJOR BREAKING NEWS: Far-Right Militants Were in Trump's Insurrection Week Command Center<br><br>Close contact between Team Trump and a 1AP militant like Robert Patrick Lewis is significant because the former has positioned itself as supporting only *administrative* insurrection—the overturning of a democratic election via dodgy backroom political maneuvers—while the latter has routinely flirted with the idea of a *paramilitary* revolt. Placing these agendas in the same room underscores the ways they were synchronized.<br><br>In his PTV interview, Lewis not only drops known QAnon slogans suggesting violent rebellion—like "**the Great Awakening**"—but he speaks animatedly about "**how deeply our government has been infiltrated by Marxists, the CCP [Chinese Communist Party], and people who have been blackmailed and bribed**"—this last allusion a likely reference, given Lewis's citation of narratives people call "**conspiracy theories**" that are (in his view) actually accurate, to the QAnon-fostered notion that Democratic and Republican members | Doc. 20-5 at 8-9 |
| 13 | **The Willard Hotel, the Willard Hotel Fire, and the Near-Riot at Black Lives Matter Plaza on Insurrection Eve**<br><br>The congregation of radical militant extremists like 1AP not just at the Willard Hotel generally but with members of Team Trump, Stop the Steal, and InfoWars specifically matters because these entities—with the Proud Boys—were the four most responsible for the planning and coordination of the events of January 6, with the Oath Keepers (many of whom apparently congregated at the Willard Hotel also, acting as bodyguards for members of the Stop the Steal and InfoWars camp) serving as important adjuncts to the effort. More broadly, the fact that the Willard Hotel was a launching ground for a near-riot on January 5, and that the said launch was coordinated by Roger Stone's InfoWars co-host Owen Shroyer; filmed by Proud Boy **Tim Gionet**; aided by InfoWars guest analyst **Tayler Hansen**; attended by leading (white supremacist) Groyper Army member Matt Colligan; and preceded by Stone inexplicably vacating the Willard at a time he now says he considered the streets of DC to be "**chaotic**" and "**disorganized**" and too dangerous to go out in even more fully sets the scene of the Willard as Ground Zero for the January 6 insurrection. With this in mind, it's worth | Doc. 20-5 at 10 |

| | | |
|---|---|---|
| 14 | **January 5: The InfoWars Suite**<br><br>In a brief span of time on Insurrection Eve—the three hours between noon and 3PM— InfoWars' Willard suite played host to the following insurrectionists (at a minimum):<br><br>• Alex Jones<br>• Roger Stone<br>• Owen Shroyer<br>• Michael Flynn*<br><br>ABRAMSON-0041<br><br>https://sethabramson.substack.com/p/major-breaking-news-far-right-militants?s=r<br><br>/27/22, 4:40 PM    Case 1:22-MAJOR BREAKING NEWS: Far-Right Militants Watch Trump's Insurrection Week Command Center<br><br>• Michael Flynn Jr.**<br>• Patrick Byrne***<br>• Pastor Randy Coggins II<br>• 1st Amendment Praetorians****<br><br>*Of Team Kraken and the Jericho March as well as Team Trump.<br>**Per social media photos he has since posted.<br>***Of Team Kraken, as well as the former CEO of Overstock.<br>****Names and numbers unknown, but there "protecting" both Byrne and Flynn. | Doc.<br>20-5 at<br>11-12 |

| | | |
|---|---|---|
| 17 | 8/ There are days I think the January 6 insurrection is the *single strangest thing* that's ever happened in U.S. history, like it represented a clash not of world-views but *actual whole realities*—a "rift in time" in which each side of America suddenly actually *saw* the other.<br><br>9/ For instance, do readers of this feed realize that roughly 25% of voting Americans appear to believe that the DCMP SWAT team that showed up seconds after Ashli Babbitt was shot…<br><br>…was fake? Yes—they think it was a *fake SWAT team*. Sent by the Deep State. They really do.<br><br>10/ But it's not just, like, anonymous Twitter feeds with way too many numbers in their handles that believe this.<br><br>Robert Patrick Lewis—who was advising the president's team on January 6—believes this.<br><br>He believes—or says he does—that the Deep State was using fake SWAT teams.<br><br>11/ Think of how much danger the United States is in if the Republican who is most likely to run for president in 2024 is someone advised by people who *literally*—I'm not screwing around—might be subjected to a court-ordered psychiatric evaluation if and when they are arrested.<br><br>12/ And you'd think that at least Trump's *lawyers* aren't that deranged—just the men advising and protecting them, like Lewis from 1AP. So how do we explain former Trump lawyer Lin Wood having said that Trump remains president and still has control of our military? It's *scary*. | Doc. 20-8 at 16 |

| | | |
|---|---|---|
| 18 | (🔒) NEW PROOF SERIES: PROOF now takes in so much data daily on January 6—some of it not yet resolvable into a feature-length article—that this new series has been developed to allow the quick release of such information. I hope you'll subscribe and share.<br><br><br><br>**The Best Unpublished Proof Insurrection Research, Vol. 1**<br>Sometimes Proof discovers—or receives from volunteer researchers—research that doesn't fit the "Insurrection Update" series or warrant its own article. Now there's a series for such intelligence.<br>https://sethabramson.substack.com/p/the-best-unpublished-proof-insurrection<br><br>1/ Some of this info is pretty significant—it's just hard to link it to feature-length stories PROOF is working on. In Item #8, here, on Bannon, you'll find the secret to what Team Trump had planned for January 6, and it's not a narrative we've clearly heard from major media yet.<br><br>2/ But honestly I'm most scared about Item #6. Robert Patrick Lewis is a deranged militant extremist who had access to top members of Team Trump on Insurrection Eve and Insurrection Day. To hear his views at such length.... I believe he's a legitimate danger to national security. | Doc. 20-8 at 15 |

| | | |
|---|---|---|
| 19 | 8/ There are days I think the January 6 insurrection is the *single strangest thing* that's ever happened in U.S. history, like it represented a clash not of world-views but *actual whole realities*—a "rift in time" in which each side of America suddenly actually *saw* the other.<br><br>9/ For instance, do readers of this feed realize that roughly 25% of voting Americans appear to believe that the DCMP SWAT team that showed up seconds after Ashli Babbitt was shot...<br><br>...was fake? Yes—they think it was a *fake SWAT team*. Sent by the Deep State. They really do.<br><br>10/ But it's not just, like, anonymous Twitter feeds with way too many numbers in their handles that believe this.<br><br>Robert Patrick Lewis—who was advising the president's team on January 6—believes this.<br><br>He believes—or says he does—that the Deep State was using fake SWAT teams.<br><br>11/ Think of how much danger the United States is in if the Republican who is most likely to run for president in 2024 is someone advised by people who *literally*—I'm not screwing around—might be subjected to a court-ordered psychiatric evaluation if and when they are arrested.<br><br>12/ And you'd think that at least Trump's *lawyers* aren't that deranged—just the men advising and protecting them, like Lewis from 1AP. So how do we explain former Trump lawyer Lin Wood having said that Trump remains president and still has control of our military? It's *scary*. | Doc. 20-8 at 16 |
| 20 | Lewis also tells his two interviewers that 1AP provided security services post-election to a "whistleblower" who had brought "evidence" of supposed election fraud to Sidney Powell shortly after the election, which revelation certainly puts Lewis into the ambit of Trump's legal team in November rather than merely January 2021. Lewis says that the so-called whistleblower in question had evidence that ballots had been flown into the United States pre-election from South Korea on a public airline as well as "private jets." Again, I believe that a federal judge would—and may yet—order a psychiatric evaluation for this man, who acted as a high-level adviser to Trump's legal team pre-, mid-, and post-insurrection. From mid-November through January, Lewis says, 1AP had a detail on all three of Sidney Powell, | Doc. 20-6 at 10 |

| | | |
|---|---|---|
| 24 | **War Room #2: The Willard Hotel War Room**<br><br>**Known and Identified Participants**<br><br>- (**1**) **Christina Bobb, One America News Network** (OANN) host, aide to Giuliani<br>- (**2**) **John Eastman**, then-professor at **Chapman University School of Law**<br>- (**3**) **Rudy Giuliani**, personal attorney to then-president Trump<br>- (**4**) **Robert Hyde**, Trump associate involved in the **Trump-Ukraine** scandal<br>- (**5**) **Joe Oltmann** (a.k.a. "**Joe Otto**"), co-founder of **FEC United**, a Colorado group closely linked to the **United American Defense Force** (UADF), a far-right militia<br>- (**6**) **Russell ("Russ") Ramsland, Jr., Allied Security Operations Group**<br>- (**7**) **Maria Ryan**, girlfriend of Rudy Giuliani and Giuliani aide<br><br>This roster was subsequently expanded to include **Phillip Luelsdorff**, the Director of Business Development for a domestic-extremist paramilitary group, **1st Amendment Praetorians**. *Proof* also provided significant evidence that Luelsdorff's boss, **Robert Patrick Lewis—the founder of the 1st Amendment Praetorians—was also inside the Willard Hotel war room. Lewis had been running a private intelligence operation for Team Trump to try to establish that the 2020 election was stolen by a multinational cabal of pro-communist interests in China, Russia, North Korea, Venezuela, and Iran (yes, Lewis's conspiracy theory is just as preposterous as it sounds, but nevertheless it ended up forming the sum and substance of Sidney Powell's preposterous, knowingly false "Kraken" allegations; these false allegations, and Powell's work on them, appear to have so alarmed the Chinese, Russians and Iranians that they risked plunging the U.S. into a dangerous and wholly unwarranted military confrontation with Beijing.** | Doc. 20-7 at 4 |
| 26 | 11/ A major break in PROOF's exclusive reporting on the Willard came on the last day of June 2021, with the crowd-sourced revelation of who the mysterious "man in the white shirt" was in Robert Hyde's photos. It turned out he's a domestic extremist leader.<br><br><br><br>**MAJOR BREAKING NEWS: Far-Right Militants Were in Trump's Insurre…**<br>Proof reveals three new participants in Trump's Insurrection Week war room: one a militant, two who helped a Capitol-breaching Stop the Steal insurrectionist broadcast Trump propaganda from January 6…<br>https://sethabramson.substack.com/p/major-breaking-news-far-right-militants | Doc. 20-8 at 27 |

| 29 | PS5/ One of the money quotes in the ROLLING STONE article:<br><br>"The breaking point for me [on January 6 was when] Trump start[ed] talking about walking to the Capitol [with the crowd]," the organizer says. "I was like, 'Let's get the fuck out of here.'"<br><br>PS6/ And kudos to ROLLING STONE for mentioning (albeit only in passing) the insurrectionist paramilitary extremist group 1st Amendment Praetorians. PROOF has reported that one of the leaders of the group was *in Trump's war room* during Insurrection Week:<br><br><br><br>**MAJOR BREAKING NEWS: Far-Right Militants Were in Trump's Insurre...**<br>Proof reveals three new participants in Trump's Insurrection Week war room: one a militant, two who helped a Capitol-breaching Stop the Steal insurrectionist broadcast Trump propaganda from January 8...<br>https://sethabramson.substack.com/p/major-breaking-news-far-right-militants | Doc. 20-8 at 36 |



| | | |
|---|---|---|
| 35 | Seth Abramson ✔ @SethAbramson · Jan 10<br><br>(PS) And incredibly, even in this lengthy article about 1AP, the New York Times misses the fact that the #2 man in the organization was identified by PROOF *by name* from photographs taken *inside the Willard Hotel war room* on Insurrection Eve/Insurrection Day. It's shocking…<br><br>💬 6    🔁 90    ♡ 342<br><br>Seth Abramson ✔<br>@SethAbramson<br><br>(PS2) …given that PROOF has itemized the dozens and dozens of New York Times journalists who follow the PROOF project. How could they have missed this major report on the 1st Amendment Praetorians from back in *June of 2021*, more than half a year ago? | Doc. 20-8 at 38 |
| 39 | MORE/ PROOF UNLOCKED (🔓) from over a year ago (June 2021):<br><br>MAJOR BREAKING NEWS: Far-Right Militants Were in Trump's Insurre…<br>Proof reveals three new participants in Trump's Insurrection Week war room: one a militant, two who helped a Capitol-breaching Stop the Steal insurrectionist broadcast Trump propaganda from January 6…<br>https://sethabramson.substack.com/p/major-breaking-news-far-right-militants | Doc. 20-8 at 50 |

| | 10/ Every time the HJ6C interviews a new witness, it (a) increases the odds it'll go back to prior witnesses (remember that some witnesses, like Cassidy Hutchinson, have been spoken to five or more times), and (b) reveals—if someone takes the 5th—where the Committee should focus. | Doc. 20-8 at 54 |
|---|---|---|
| 41 | 11/ The number of Trumpworld witnesses taking the 5th—meaning they think if they answer questions honestly they may incriminate themselves—is startling. Jeffrey Clark, John Eastman, Michael Flynn, Roger Stone, Garrett Ziegler, and Robert Patrick Lewis are a few in this category. | |

## C.    Statements Not Alleged to be False

| No. | Statement | Source |
|---|---|---|
| 16 | **(PS3)** My favorite part of this story is how many unrepentant ex-cons are in it, how many pastors are hanging out with these ex-cons, and how many of these folks are in Trump's milieu.<br><br>🟥 EX-CONS<br>Stone<br>Alexander<br>Davis<br>Kerik<br>Papadopoulos<br>Tarrio<br>Manafort<br><br>🟪 PASTORS<br>Burns<br>Coggins<br><br>**(PS4)** If we just looked at people under criminal investigation or who've been arrested in the past, the number of people here in the relevant category would be at least 8:<br><br>🟫 UNDER INVESTIGATION/ARREST RECORD<br>Giuliani<br>Luelsdorff<br>6 Oath Keepers<br><br>Oh, and I forgot!<br><br>🟥 EX-CON<br>Flynn | Doc. 20-8 at 14 |
| 40 | Lewis "drove Flynn, Powell, and Byrne to the White House on December 18, 2020 for a coupplotting meeting" and participated in a "covert operation" and "potentially treasonous 'December Conspiracy'—a December 2020 Trumpist plot to use the US Armed Forces to end American democracy" | Doc. 16 at 14 |

D.   Actionable Statements

| No. | Statement | Source |
|---|---|---|
| 4 | PROOF is taking it slow and steady. I'm not yet convinced Daniel Bostic was in the Willard war room as some have said, but I'm trying to run it down. That said, an eighth member of the war room *will* be revealed—and discussed at length—at PROOF next week.<br><br><br><br>It's increasingly clear that the Willard Hotel was *the* Trump "command center" on Insurrection Day. (Trump International Hotel was the most active war room on Insurrection Eve, and the White House the most active one from December 21 through January 4.) So this research matters.<br><br>The Holy Grail is placing dangerous far-right domestic-extremist militants inside Trump's Willard Hotel command center on Insurrection Day. By the end of next week—based on what PROOF will publish and what others are working on—the Grail will have been both found and made public.<br><br>Slow and steady is still acceptable for now—despite the ongoing emergency of a domestic insurgency—because PROOF and some talented citizen journalists online are literally six months to a year ahead of major media, the FBI, and Congress re: investigating insurrectionist kingpins.<br><br>That said, it must be universally understood that people like Michael Flynn and Sidney Powell and Robert Patrick Lewis and Donald Trump are legitimately dangerous domestic insurgents. Everywhere they go and everywhere they speak, they expand a clear and present danger to America. | Doc. 20-8 at 2 |

| | | |
|---|---|---|
| 5 | (VS) MAJOR BREAKING NEWS: Trump Was in Contact with Insurrectionist Leaders on Insurrection Eve<br><br>Ivanka possibly lying in a depo went viral this morning. The bigger news that Trump contacted insurrectionist leaders on Insurrection Eve should go viral now.<br><br><br><br>**MAJOR BREAKING NEWS: Trump Was in Contact with Insurrectionist ...**<br>Reports indicating Donald Trump spoke with insurrectionist leaders on both January 3 and Insurrection Day is now joined by evidence he spoke to them January 5—even as they plotted out January 6.<br><br>https://sethabramson.substack.com/p/major-breaking-news-trump-was-in<br><br>1/ Mountains of evidence—all compiled by PROOF, with full sourcing—now establishes that Insurrection Day was the work of coordination between the White House, Stop the Steal, InfoWars and the Proud Boys, with the Oath Keepers, Three Percenters, QAnoners and 1AP in support roles. | Doc. 20-8 at 4 |
| 6 | ## Introduction<br><br>It's become clear, based on emerging evidence produced by OSINT digital research, that January 6 was coordinated by four entities—the White House, Stop the Steal, InfoWars, and<br><br>https://sethabramson.substack.com/p/major-breaking-news-trump-was-in?s=r      ABRAMSON-0016    1<br><br>/27/22, 4:41 PM   Case 1:22-(MAJOR BREAKING NEWS: Trump Was in Contact with Insurrectionist Leaders on Insurrection Eve<br><br>the Proud Boys—with the Oath Keepers running security for Stop the Steal, the 1st Amendment Praetorians (1AP) acting as security for top agents of Team Trump, members of Trump's historically politicized Secret Service acting as liaisons between Team Trump and the insurrectionist and militant groups present in DC in the first week of January, and all of this seditious activity centering around one location in Washington: the Willard InterContinental Hotel near Freedom Plaza. | Doc. 20-4 at 2-3 |

This is why sometimes—not always—going straight to the source is valuable. I reported that the Willard was a "war room" because two of the participants, domestic extremists Joe Oltmann and Robert Patrick Lewis, *called it that* in videos. Now this guy implies I devised the term.

Doc. 20-8 at 18

25





| | | Doc. 20-8 at 37 |
|---|---|---|
| | ≥ There were *many* January 6 war rooms inside the Willard, e.g.:<br><br>ations<br>ges<br>iarks<br>1 Trump Legal<br>2 1st Amendment Praetorian/Team Kraken<br>3 Team Stone<br>4 Team Bannon (Stockton/Lawrence)<br>5 March for Trump | |
| 34 | And there's evidence of the Proud Boys and Women for America First having a presence there.<br><br>Hugo Lowell ✔ @hugolowell · Dec 27, 2021<br>Really important re Trump War Rooms at the Willard: there were MULTIPLE war rooms — Trump lawyers Giuliani, Eastman, Epshteyn plus Bannon was one "command center." Flynn and Stone had a separate operation.<br><br>eet<br>ec 27, 2021 · Twitter Web App<br><br>421 Retweets    12 Quote Tweets    904 Likes | |

| 37 |  | Doc. 20-8 at 39-40, 49 |

NOTE4/ If you want to get a better sense of the organization Robert Patrick Lewis leads, Mother Jones reported this spring on 1AP allegedly threatening to kill a federal witness who had spoken to the House January 6 Committee. You can hear the audio here:



**Exclusive audio: Far-right paramilitary member warned 1/6 committee ...**
"You talk a lot publicly, and that's what makes you a target."
https://www.motherjones.com/politics/2022/04/first-amendment-praetorian-january-6-c...

NOTE5/ I strongly urge Americans to familiarize themselves with the 1st Amendment Praetorians and their leader Robert Patrick Lewis by reading the following investigative report on the group at The Daily Beast (still just the tip of the iceberg as to 1AP): https://www.thedailybeast.com/1st-amendment-praetorian-the-far-right-paramilitary-wannabes-feeding-mike-flynns-conspiracy-machine

---

| 38 | NOTE5/ I strongly urge Americans to familiarize themselves with the 1st Amendment Praetorians and their leader Robert Patrick Lewis by reading the following investigative report on the group at The Daily Beast (still just the tip of the iceberg as to 1AP): https://www.thedailybeast.com/1st-amendment-praetorian-the-far-right-paramilitary-wannabes-feeding-mike-flynns-conspiracy-machine<br><br>MORE/ "1AP members don't appear to have stormed the Capitol, but at least one operative—Geoffrey Flohr—circled it as the attack was underway, talking covertly via an earpiece. Another—Philip Luelsdorff—observed from a war room led by Giuliani and Eastman."<br><br><br><br>**Trump's possible ties to far-right militias examined by January 6 com...**<br>Capitol attack panel expected to examine links between Trump and the extremist groups in closer detail at seventh public hearing<br>https://www.theguardian.com/us-news/2022/jul/07/next-jan-6-hearing-trump-far-right-m... | Doc. 20-8 at 49 |