# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**Robert Patrick Lewis et al.**

   v.                                        Case No. 22-cv-126-PB
                                             Opinion No. 2026 DNH 098

**Seth Abramson**

## MEMORANDUM AND ORDER

Seth Abramson, an attorney and journalist, published a series of articles and tweets alleging that plaintiffs 1st Amendment Praetorians ("1AP"), its founder, Robert Partick Lewis, and one of its members, Philip Luelsdorff, were militant extremists involved in the effort to overturn the results of the 2020 presidential election. The plaintiffs brought suit against Abramson, alleging defamation, conspiracy, and false-light invasion-of-privacy claims. Abramson moved to dismiss the complaint in its entirety. After examining the sufficiency of the plaintiffs' claims, I dismissed their defamation-by-implication and conspiracy claims. Doc. 26 at 51. I also determined that thirty-four of the forty-one statements the plaintiffs claimed were defamatory could not support their defamation and false-light claims. Id. The parties later stipulated to the dismissal of the false-light claims, Doc. 105, leaving only the defamation claims for the remining seven statements.

Abramson now moves for summary judgment, arguing that he is entitled to judgment because the plaintiffs are limited-purpose public figures and there is no evidence that Abramson acted with actual malice. For the reasons that follow, I grant Abramson's motion in part and deny it in part.

## I.  BACKGROUND

### A.    The Events of January 6, 2021

As I noted in my order resolving Abramson's motion to dismiss, the events of January 6, 2021 form the backdrop of this case and warrant brief discussion. Doc. 26 at 1-3.

In 2020, after Joe Biden was elected President of the United States, then-first-term-President Donald Trump "refused to concede, claiming that the election was 'rigged' and characterized by 'tremendous voter fraud and irregularities.'" Trump v. Thompson, 20 F.4th 10, 17 (D.C. Cir. 2021) (citation modified). Trump retained a team of attorneys, including Rudy Giuliani and John Eastman, to investigate alleged voter fraud in the 2020 election and fashion legal strategies to challenge the election results. See U.S. Dominion, Inc. v. Fox News Network, LLC, 2023 WL 2730567, at *5 & n.83 (Del. Super. Ct. Mar. 31, 2023); Eastman v. Thompson, 2022 WL 1407965, at *1-2 (C.D. Cal. Jan. 25, 2022). Pertinent here, several supporters of this effort to challenge the election, including both Eastman and Giuliani, created a so-called "war room" at the Willard Hotel in Washington, D.C. in the days

preceding January 6, 2021—the day on which election results were to be certified by Congress. Eastman, 2022 WL 1407965, at *2; Doc. 16 at 20. In the "war room," these supporters explored legal strategies for "delaying or blocking the certification of the election." Eastman, 2022 WL 1407965, at *2.

Pursuant to the Electoral Count Act, 3 U.S.C. § 15, and the Twelfth Amendment, Congress met on January 6, 2021 in a joint session to certify the results of the 2020 presidential election. United States v. Montgomery, 578 F. Supp. 3d 54, 59 (D.D.C. Dec. 28, 2021). That same day, Trump headlined a rally on the Ellipse, south of the White House, at which he "reiterated his unfounded claims that the election was 'rigged' and 'stolen.'" United States v. Connell, 2025 WL 326590, at *1 (D.D.C. Jan. 29, 2025) (quoting Trump, 20 F.4th at 18). After his speech, a "large crowd of President Trump's supporters . . . marched to the Capitol and violently broke into the building to try and prevent Congress's certification of election results." Trump, 20 F.4th at 18. "Members of Congress and the Vice President were forced to flee for their safety," United States v. Adams, 731 F. Supp. 3d 8, 12 (D.D.C. 2024), and "[a]ll told, the riot caused millions of dollars in damage to the Capitol, and approximately 140 law enforcement officers were injured in the fighting," United States v. McHugh, 583 F. Supp. 3d 1, 8 (D.D.C. 2022).

## B.    The Plaintiffs

Robert Patrick Lewis founded 1AP in 2020 "to provide pro bono security and protective services at grassroots events." Doc. 16 at 1. Philip Luelsdorff was a member of 1AP. Doc. 108-25 at 3.

On January 6, 2021, Lewis attended President Trump's speech at the Ellipse. Doc. 16 at 24. After the speech, he left, stopped by his hotel room to change, and spent the rest of the day at the Willard Hotel. Id. He contends that he neither entered nor participated in the activities of "any 'war room'" there. Id.

Luelsdorff was likewise in Washington, D.C. on January 6. Pursuant to his responsibilities for 1AP, he escorted General Michael Flynn to Trump's speech at the Ellipse. Doc. 108-25 at 6. Flynn fired Luelsdorff and his other 1AP security detail on his way to the speech, but Luelsdorff still attended the speech in its entirety. Id. at 6-7. Afterwards, Lewis directed Luelsdorff to go to the suite of Cindy Chafian, another election fraud proponent, at the Willard Hotel, where he stayed with other 1AP members until around 1:00 a.m. the next morning. Id.; Doc. 108-1 at 11. Luelsdorff left Chafian's suite several times to "bring people up" to the suite and was "asked to go to Rudy Giuliani's room." Doc. 108-25 at 7. Luelsdorff alleges that when he arrived at Giuliani's room, he was "told to wait outside" and then "walked in."

4

Id. at 8. A woman inside told him "[y]ou don't belong here," and he walked out of the room after "[l]less than a minute or two." Id.

C.    **Abramson's Reporting**

Abramson is an attorney and journalist who publishes a substack[1] entitled "Proof," which he founded shortly after January 6 to "contribute to public discourse" by "responding [to] and reacting [to] and analyzing" that day. Doc. 108-33 at 21; see also Doc. 20-3 through 20-7.

On June 21, 2021, Abramson began publishing substacks and tweets discussing the Willard room, its alleged relationship to the events of January 6, and its suspected participants. Doc. 20-3 at 6-10. His June 21 substack included a photograph of Luelsdorff standing in the Willard room near Eastman and Giuliani. Id. at 9. Although Abramson did not initially identify Luelsdorff by name when posting the photograph, he updated the original post on June 30 to identify Luelsdorff. Id.

In a June 30 substack, Abramson wrote about 1AP, Lewis, and Luelsdorff extensively, focusing on an interview Lewis did with a podcast called "Patriot Transition Voice" on January 7, 2021. Doc. 20-5 at 2-10. In

---

[1]    Substack is a subscription email newsletter platform "which allows writers to send digital newsletters directly to their readers and monetize their work by putting it behind a paywall." Falon Fatemi, The Rise of Substack—And What's Behind It, Forbes (Jan. 20, 2021), [https://perma.cc/Z2BZ-P3ZH]; see also Doc. 22 at 4 n.2.

that interview, Lewis indicated that he had spent the week preceding the interview with "very well known, very high profile people on the conservative side" and said that he believed the election was fraudulent. Doc. 20-10 at 33-86. In his substack, Abramson analyzed many of the statements Lewis made on the podcast and, after assessing the interview, concluded that Lewis was in the Willard room. Doc. 20-5 at 4-7. Based on both this conclusion and the photograph of Luelsdorff he had previously published, Abramson stated in his June 30 substack that 1AP was involved in the Willard room. Id. at 5.

On July 12, Abramson posted another substack in which he discussed both Lewis and 1AP. Doc. 20-6. In that publication, Abramson focused on an interview of Lewis on a podcast entitled "After Dark with Andrew and Rob." Id. at 8-11. He highlighted the fact that Lewis made several comments pertaining to the effort to challenge the 2020 election in that interview, including that Lewis had met with Eastman several times and "got to hear him talk about . . . ways that we could do things and ways that we could rectify the situation." Id.; see Doc. 20-11 at 13. He also noted that Lewis additionally commented in the interview that videos depicting scenes from the attack on the Capitol could have been "staged" and raised questions as to whether "Marxists have infiltrated [federal] [i]ntelligence services." Doc. 20-6; see Doc. 20-11 at 24, 31. Based on these comments and others Lewis made in his After Dark interview, Abramson reiterated in his July 12

6

substack that Lewis had been present in the Willard room. Doc. 20-6 at 9.

Moreover, Abramson wrote that Lewis's interview comments, particularly

those relating to conspiracy theories, could be "seen as a sign of such

significant derangement that it requires a court-ordered psychiatric

evaluation." Id. at 10.

Additionally, Abramson referenced each of the three plaintiffs in

several tweets he published to his sizable Twitter following in the weeks and

months after January 6. See Doc. 16 at 4-14, 22. The tweets discussed the

plaintiffs' involvement in the Willard room, classified them as

"insurrectionists," "extremist militants," and a "legitimate danger to national

security," and otherwise discussed their involvement in the effort to challenge

the 2020 presidential election. Id. at 4-14.

The plaintiffs allege that Abramson's statements caused them to suffer

significant personal and economic harm. Id. at 17. They claim that they have

been subjected to "public scorn, ridicule and contempt." Id. Lewis and

Luelsdorff have suffered "embarrassment," "mental anguish," and "fear of

bodily injury and death," in addition to losing clients for their businesses. Id.

at 32. Additionally, they allege that 1AP has lost donors. Id. at 31-32.[2]

---

[2]    The plaintiffs have since abandoned any claim that the defamatory statements caused them to lose business, income, earning capacity, or profits. Doc. 99.

**D.    Procedural Background**

The plaintiffs filed this action against Abramson invoking the Court's diversity of citizenship jurisdiction. Id. at 19. In their complaint, they allege defamation, defamation by implication, false-light invasion-of-privacy, and common law conspiracy, challenging forty-one numbered statements published by Abramson and his co-conspirators under each count. Id. at 4-37. Abramson moved to dismiss the complaint in its entirety, Doc. 20, and I granted his motion in part by dismissing the plaintiffs' defamation-by-implication and conspiracy claims. Doc. 26 at 51. Additionally, I determined that thirty-four of the allegedly defamatory statements were non-actionable, either because they were constitutionally protected opinions or, in the case of two statements, because the plaintiffs failed to sufficiently plead falsity. Id. at 21-39. As for the remaining actionable statements, I concluded that the plaintiffs could rely on those statements to support their defamation and false-light claims. Id. at 39-51. The parties later jointly filed a motion to dismiss the false-light claims with prejudice. Doc. 105. I granted that motion, leaving only the defamation claims based on the seven remaining claims.

8

Abramson published the seven actionable statements between June 26, 2021 and July 8, 2022. They read and are numbered as follows:[3]

> Statement 4: The Holy Grail is placing dangerous far-right domestic-extremist militants inside Trump's Willard Hotel command center on Insurrection Day. By the end of next week—based on what PROOF will publish and what others are working on—the Grail will have been both found and made public. . . . That said, it must be universally understood that people like Michael Flynn and Sidney Powell and Robert Patrick Lewis and Donald Trump are legitimately dangerous domestic insurgents. Everywhere they go and everywhere they speak, they expand a clear and present danger to America. Doc. 20-8 at 2 (allegedly defaming Lewis).

> Statement 5: Mountains of evidence—all compiled by PROOF, with full sourcing—now establishes that Insurrection Day was the work of coordination between the White House, Stop the Steal, InfoWars and the Proud Boys, with the Oath Keepers, Three Percenters, QAnoners and 1AP in support roles. Id. at 4 (allegedly defaming 1AP).

> Statement 6: It's become clear, based on emerging evidence produced by OSINT digital research, that January 6 was coordinated by four entities—the **White House, Stop the Steal, InfoWars,** and the **Proud Boys**—with the . . . **1st Amendment Praetorians** (1AP) acting as security for top agents of **Team Trump** . . . and all of this seditious activity centering around one location in Washington: the **Willard InterContinental Hotel** . . . . Doc. 20-4 at 2-3 (allegedly defaming 1AP).

> Statement 25: This is why sometimes—not always—going straight to the source is valuable. I reported that the Willard was a "war room" because two of the participants, domestic extremists Joe

---

[3] I adhere to the numbering of statements presented by the plaintiffs in their amended complaint, Doc. 16. There, they challenged forty-one statements made by Abramson and his co-conspirators. After my order, Doc. 26, on Abramson's original motion to dismiss, only Statements 4, 5, 6, 25, 34, 37, and 38 remain.

Oltmann and Robert Patrick Lewis, *called it that* in videos. Now this guy implies I devised the term. Doc. 20-8 at 18 (allegedly defaming Lewis).

Statement 34: There were *many* January 6 war rooms inside the Willard, e.g.:

1 Trump Legal
2 1st Amendment Praetorian/Team Kraken
3 Team Stone
4 Team Bannon (Stockton/Lawrence)
5 March for Trump

And there's evidence of the Proud Boys and Women for America First having a presence there. Id. at 37 (allegedly defaming 1AP).

Statement 37: Mother Jones recently reported that a subordinate of Robert Patrick Lewis in 1AP (the First Amendment Praetorians), Michael Kenny, issued a death threat to a House January 6 Committee witness that he (Kenny) said was made on behalf of 1AP leadership. . . .
If you want to get a better sense of the organization Robert Patrick Lewis leads, Mother Jones reported this spring on 1AP allegedly threatening to kill a federal witness who had spoken to the House January 6 Committee. Id. at 39-40, 49 (allegedly defaming 1AP and Lewis).

Statement 38: "1AP members don't appear to have stormed the Capitol, but at least one operative—Geoffrey Flohr—circled it as the attack was underway, talking covertly via and earpiece. Another—Philip Luelsdorff—observed from a war room led by Giuliani and Eastman." Id. at 49 (allegedly defaming Luelsdorff).

Abramson now moves for summary judgment on the remaining defamation claims. Doc. 108. He argues that he is entitled to judgment because the plaintiffs are limited-purpose public figures and they cannot prove he acted with actual malice.

10

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor," Irobe, 890 F.3d at 377 (alteration in original) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In

11

considering the evidence, I must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.  ANALYSIS

In my previous order, I determined that New Hampshire law applies to the plaintiffs' defamation claims. See Doc. 26 at 11 n.4 (citing Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003)). Under New Hampshire law, "a plaintiff establishes defamation by showing that the defendant failed to exercise reasonable care in publishing a false and defamatory statement of fact about the plaintiff to a third party, unless a valid privilege applies to the communication." Thomas v. Tel. Publ'g Co., 155 N.H. 314, 327 (2007).

When a defamation plaintiff has been determined to be a public figure, however, the Supreme Court has heightened the standard he must satisfy. See N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). Whereas "private plaintiffs can succeed in defamation actions on a state-set standard of proof (typically, negligence), . . . the Constitution imposes a higher hurdle for public figures." See Pendleton v. City of Haverhill, 156 F.3d 57, 66 (1st Cir. 1998); see also McKee v. Cosby, 874 F.3d 54, 60 (1st Cir. 1997) ("Superimposed on any state's defamation law are First Amendment safeguards."). To successfully prove defamation, a public figure must show

the defendant published the allegedly defamatory statements "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." N.Y. Times, 376 U.S. at 280. Because determining whether an individual is a public figure is a question "of constitutional dimension and, thus, federal law controls," Pendleton, 156 F.3d at 68, I apply federal law to the extent necessary to determine whether the plaintiffs are public figures.

The Supreme Court has recognized three types of public figures: general-purpose, voluntary limited-purpose, and involuntary. Gertz v. Robert Welch, Inc., 418 U.S. 323, 351-52 (1974). General-purpose public figures attain that status when they achieve "general fame or notoriety in the community, and pervasive involvement in the affairs of society." Id. at 352. Voluntary limited-purpose public figures have not achieved general fame but instead have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Id. at 345. And involuntary public figures, though "exceedingly rare," are those who "become a public figure through no purposeful action of his own." Id.

Although determining whether an individual is a private figure or public figure "is inescapably fact-specific . . . and does not always lend itself to summary judgment, it is a legal question properly resolved by the court, not the jury, regardless of the contestability of the predicate facts." Franchini

13

v. Bangor Publ'g Co., Inc., 109 F.4th 13, 31 (1st Cir. 2024) (citation modified) (citing Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 14 (1st Cir. 2011), and then Pendleton, 156 F.3d at 68). When the facts underlying a court's determination of public figure status are not in dispute, "[i]t is 'perfectly reasonable' for the court to make the legal determination on the undisputed facts pretrial on summary judgment." Id. (citing McKee, 874 F.3d at 61). The defendant bears the burden of establishing that plaintiffs are public figures. Id. at 31.

Once a defendant has established that plaintiffs are public figures, the plaintiff must show that the defendant published the statements with actual malice, or "knowledge of the statement's falsity or reckless disregard for its truth." Lemelson v. Bloomberg L.P., 903 F.3d 19, 23 (1st Cir. 2018) (citing N.Y. Times, 376 U.S. at 279-80). Actual malice must be proven by clear and convincing evidence. Levesque v. Doocy, 560 F.3d 82, 87 (1st Cir. 2009). At summary judgment, courts ask "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986).

Here, Abramson argues that Lewis, 1AP, and Luelsdorff are all voluntary limited-purpose public figures, and because Abramson did not publish his statements with actual malice, he contends that he is entitled to

14

summary judgment on the remaining defamation claims. The plaintiffs

challenge both contentions. First, they argue that Abramson cannot establish

that Lewis, Luelsdorff, and 1AP are limited-purpose public figures. Second,

they argue that even if the plaintiffs are limited-purpose public figures,

genuine issues of fact remain with respect to whether Abramson acted with

actual malice.

## A.    Limited-Purpose Public Figure Status

In assessing plaintiffs' limited-purpose public figure status, I follow two

steps. First, I identify whether a "public controversy existed" at the time of

the defamation. Franchini, 109 F.4th at 31. "Once a controversy is isolated," I

then ask "whether the plaintiff has attempted to 'influence the resolution' of

that controversy." Id. at 33 (quoting Lluberes, 663 F.3d at 14). On the present

record, the facts material to assessing whether the plaintiffs are

limited-purpose public are not in dispute, and the plaintiffs do not argue

otherwise. Thus, I can resolve the issue of the plaintiffs' limited-purpose

public figure status prior to trial.

### 1.    The Public Controversy

"A public controversy exists when 'persons actually were discussing

some specific question . . . [and] a reasonable person would have expected

persons beyond the immediate participants in the dispute to feel the impact

of its resolution.'" Id. at 31 (modification in original) (quoting Lluberes, 663

F.3d at 13). The public controversy "must be more than a 'cause célèbre' . . . or 'a matter that attracts public attention.'" Lluberes, 663 F.3d at 13 (quoting Time, Inc. v. Firestone, 424 U.S. 448, 454 (1976) and then Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 167 (1979)). Additionally, the public controversy must have existed prior to the alleged defamation. McKee, 874 F.3d at 61.

In determining whether a public controversy existed, I must "isolate the public controversy." Waldbaum v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980). Isolating the public controversy at issue "is not a mere formality' because the scope of the controversy in which the plaintiff involves himself defines the bounds of his public presence." Lassonde v. Stanton, 157 N.H. 582, 590 (2008) (quoting Norris v. Bangor Publ'g Co., 53 F. Supp. 2d 495, 503 (D. Me. 1999)).

When isolating the public controversy, courts "may find that there are multiple potential controversies, and it is often true that 'a narrow controversy may be a phase of another, broader one.'" Jankovic v. Int'l Crisis Grp., 822 F.3d 576, 586 (D.C. Cir. 2016) (quoting Waldbaum, 627 F.2d at 1297 n.27). In fact, "courts often define the public controversy in expansive terms" and have "defined controversies as being broader than the narrower discussion contained in the defamatory document." Id.; see also Gray v. St. Martin's Press Inc., 1999 WL 813909, at *3 (D.N.H. May 19, 1999) (defining

the controversy broadly as "the influence of, and access provided to political figures by, powerful Washington, D.C., lobbyists" despite "plaintiff's efforts to narrowly circumscribe the scope of the 'public controversy'"). Moreover, courts often identify multiple "overlapping controversies" before examining the plaintiff's role in them. Waldbaum, 627 F.2d at 1299.

Whether defined specifically as the January 6 attack on the Capitol or more generally as efforts to challenge the 2020 presidential election, there is no doubt that a public controversy exists in the present case. "[P]ersons actually were discussing" these controversies, reasonable people would have expected the broader public "to feel the impact of [their] resolution," and they both existed prior to the alleged defamation. Franchini, 109 F.4th at 31; see also Bostic v. Daily Dot, LLC, 2023 WL 2317789, at *5 (W.D. Tex. Mar. 1, 2023) ("[I]t is self-explanatory that the validity of a national election is a matter of great public concern."). Instead, the real issue here is how the public controversy should be defined. Abramson advocates a broader approach, characterizing the controversy as "the legitimacy of the 2020 presidential election and actions taken to assist efforts to challenge the election." Doc. 108-1 at 14. The plaintiffs, on the other hand, contend that the controversy should be limited to the "January 6 'insurrection' and attack on the Capitol." Doc. 113 at 14.

In the present case, the plaintiffs' attempts to narrow the scope of the public controversy are unavailing. They fail to acknowledge Jankovic and Waldbaum's discussion of overlapping controversies and instead contend that the public controversy must be limited to the content of the defamatory statements. See Jankovic, 822 F.3d at 586; Waldbaum, 627 F.2d at 1299. Building from this incorrect assumption, they argue that because the actionable statements discuss the January 6 attack on the Capitol and convey to readers that the plaintiffs were associated with the violent events of that day, the public controversy must be limited to the "January 6 'insurrection' and attack on the Capitol". Doc. 113 at 14.[4]

That argument misunderstands the law. As other courts have held, "the scope of a public controversy is not limited to the debate in the alleged defamatory document." Prince v. Intercept, 634 F. Supp. 3d 114, 136 (S.D.N.Y. 2022); see also Jankovic, 822 F.3d at 586. Instead, a court must define a public controversy in isolation and before examining the content of the defamatory statements. See Franchini, 109 F.4th at 31-33. To be clear, the content of the defamatory statements is still relevant in determining

---

[4]   The plaintiffs' argument here rests on their incorrect assumption that all of the actionable statements only address the events of January 6. That is not true. And, even if it were true, the plaintiffs' argument would fail because a public controversy is not limited by the discussion contained within the defamatory documents. See Jankovic, 822 F.3d at 586.

whether those statements are related to the plaintiff's participation in the public controversy. See Waldbaum, 627 F.2d at 1298 ("[The alleged defamation must have been germane to the plaintiff's participation in the controversy . . . Misstatements wholly unrelated to the public controversy . . . do not receive the New York Times [sic] protection."). But it is only after the court has defined the public controversy that it must examine whether the defamatory statements are germane to plaintiffs' participation in it. Thus, the content of the defamatory statements does not limit the scope of the public controversy. Just because some of the actionable statements only discuss the January 6 insurrection does not mean the public controversy should be so limited.

Instead, Abramson is correct that the public controversy should be broadly defined as "the legitimacy of the 2020 presidential election and actions taken to assist efforts to challenge the election." Doc. 108-1 at 14. As I noted in my previous order, efforts to challenge the election took on two forms: some individuals involved in the effort "explore[d] legal strategies for delaying or blocking the certification of the election" while others "violently broke into the [Capitol] to try and prevent Congress's certification of the election results." Doc. 26 at 2-3 (citation modified). The public controversy as the plaintiffs define it—the January 6 insurrection and attack on the Capitol—is a narrow part of a broader controversy regarding efforts to

challenge the 2020 presidential election. I thus adopt Abramson's broader definition for the purposes of this limited-purpose public figure analysis.

In the context of this broader definition, there is no question that the defamatory statements are germane to the plaintiffs' involvement in the public controversy. Waldbaum, 627 F.2d at 1298. The seven actionable statements discuss the plaintiffs' involvement in "Insurrection Day" (statements 4 and 5), the Willard "war room" (statements 6, 25, 34, and 38), and subsequent efforts to influence Congress's investigation into those involved in January 6 (statement 37). Thus, it is clear that each of the defamatory statements is related to the plaintiffs' involvement in challenging the "the legitimacy of the 2020 presidential election."

2.    Plaintiffs' Involvement

Having defined the public controversy, I now ask whether the plaintiffs attempted to "influence" its outcome. Franchini, 109 F.4th at 33 (citing Lluberes, 663 F.3d at 14). For a person to be a limited-purpose public figure, the plaintiff must "voluntarily inject himself," Pendleton, 156 F.3d at 69, or "thrust[ himself] into the vortex," Bruno & Stillman v. Globe Newspaper Co., 633 F.2d 583 591 (1st Cir. 1980), "of a controversy and attempt[] to influence its outcome." Franchini, 109 F.4th at 33. "Trivial or tangential participation is not enough." Waldbaum, 627 F.2d at 1297. The First Circuit has held that an individual thrusts himself into a public controversy when, among other

things, he has "made (and authorized the publication of) statements bearing on the controversy or sought to influence public opinion" about, or otherwise "invite[d] public attention, comment, and criticism" "regarding the controversy." Franchini, 109 F.4th at 33 (citation modified).

Here, where there are three separate plaintiffs, I assess each plaintiff's participation individually.

### a. Robert Patrick Lewis

Abramson argues that Lewis thrust himself to the forefront of efforts to challenge the 2020 election by publicly voicing doubts about the legitimacy of the election and encouraging others to "attend protests and speak out on election fraud." Doc. 108-1 at 16. I agree. On January 5, Lewis spoke at a rally that was held to discuss the "belief that the 2020 election was not won by Joseph Biden." Doc. 108-3 at 6. In his rally speech, he encouraged attendees to "take back the country," said he was going to make sure "we don't cede this country," and asked rally-goers to "fight as hard as you can to ensure that that" the country does not become "a Communist hellhole." Doc. 108-21. Moreover, he voiced concerns about the legitimacy of the 2020 election to the Epoch Times in an article published on December 13, 2020. See Doc. 108-23. In that article, he is quoted discussing 1AP's work protecting individuals who would not "allow our election to be stolen" and noting that "one of the things that really worries me, [sic] is that we know

21

there's outside influences in a lot of what's going on [with the election]." Id. at 2. He spoke on two different podcasts, Patriot Transition Voice and After Dark, about the effects of "election fraud" on the 2020 presidential election and his belief that videos of the attack on the Capitol may have been "staged." Doc. 109-2 at 16-22, 32-39; Doc. 108-8 at 23.

In addition to these public appearances and media interviews, Lewis published both tweets and videos about his belief that the 2020 election results were not legitimate. He tweeted on several occasions from November to December 2020 about efforts to challenge the results of the election. He once asked his Twitter followers to "read up on 'The Battle of Athens,'" Doc. 108-15, a historical event which he later described in testimony as an armed conflict in which "disaffected war veterans" shot "corrupt sheriffs who were ballot rigging," Doc. 108-5 at 2. Another time, he tweeted that "[e]very part of the #Georgia election process was illegal." Doc. 108-17. Additionally, days after then-first-term-President Trump tweeted about the "Big protest in D.C. on January 6th" and encouraged people to attend, Doc. 108-18, Lewis tweeted that "@realDonaldTrump is asking all Patriots to report DC [sic] as a 'show of force' based on what else is going on that day (1/6/21)," Doc. 108-19, adding, "[n]ow your Commander in Chief has spoken. You're fresh out of reasons not to a be part of this movement." Doc. 108-20. The most popular of Lewis's tweets in the record received approximately 13,000 likes and 400 comments.

Doc. 108-19. In addition, Lewis used YouTube, Bitchute, and Rumble to distribute videos in which he both discussed 1AP's services at upcoming events and opined about his theories regarding the 2020 election. Doc. 108-1 at 5-6.

Considered in totality, this evidence establishes that Lewis, through his public speeches, interviews with both news media and podcasts, and written and verbal online statements to a significant audience, attempted to influence the resolution of the public controversy at issue here and is a limited-purpose public figure.

### b.    1AP

Abramson likewise argues that 1AP is a limited-purpose public figure. The First Circuit has made clear that corporations, like 1AP, are not presumptively considered "public figures" in all cases; instead, the public figure status of a corporation is evaluated under the same analysis applied to individuals. See Bruno & Stillman, 633 F.2d at 592. Bruno & Stillman instructs courts to examine "whether the prominence, power, or involvement of the [plaintiff] company in respect to the controversy—or its public efforts to influence the results of such controversy—were such as to merit public figure treatment." Id.

Under this framework, Abramson argues that 1AP's public figure status stems from the actions of Lewis, Luelsdorff, and the rest of its

members on its behalf. Abramson's argument that the actions of Luelsdorff and other unnamed 1AP members can be imputed to the corporation is without merit. However, because Lewis serves as 1AP's founder and executive Chairman of the Board, see Doc. 108-4 at 8; Doc. 108-3 at 4, his actions can be imputed to 1AP under traditional principles of agency law.

"A corporation can act only through its agents." Coach, Inc. v. Sapatis, 2014 DNH 140, 27 F. Supp. 3d 239, 245 (D.N.H. 2014). "A basic tenet of corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself." Stewart v. Wilmington Trust SP Serv., Inc., 112 A.3d 271, 302-03 (Del. Ch. 2015).[5] Under Delaware law, "[g]enerally speaking officers of a corporation are often spoken of as its agents." N. Assur. Co. v. Rachlin Clothes Shop, 125 A. 184, 188. However, when a person "was the only acting officer" and "also acted as the board of directors [and] the governing body of the corporation," his role is more than that of an agent. Id. "[I]n matters of superior control and management and in matters having to do with the ultimate direction of its affairs, the officers who possess the governing control are to be regarded as the corporation itself." Id. These officers "are the ultimate source from which

---

[5]    1AP is incorporated under the laws of the state of Delaware. Doc. 108-2.

24

flows the authority for all the corporate activity. . . [t]hey stand in the corporation's place and are, so to speak, its alter ego." Id.

In the present case, the evidence demonstrates that Lewis was more than an agent of the corporation: he was the alter ego of 1AP and his actions should be considered those of the corporation. At oral argument, the plaintiffs did not challenge the contention that Lewis is the founder, executive Chair of the Board, and principal actor of 1AP. Lewis spoke as the alter ego of 1AP, rather than exclusively in his individual capacity, when he opined about the election's legitimacy at rallies and in interviews. At the January 5 rally, he introduced himself as the "Founder of First Amendment Praetorians" and advertised the corporation's mission of "doing intelligence to make sure that we know if there's a threat coming," suggesting that political opponents caused these impending threats. Doc. 108-21. In the article published by the Epoch Times, Lewis was identified as the "co-founder" of 1AP, described the meaning behind the group's name and its mission, and then articulated his belief that there had been "outside influences" in the election. Doc. 108-23 at 1-3. He began his interview on After Dark by stating he was in Washington D.C. and at Trump's rally on January 6 because of work with "my group, 1st Amendment Praetorian." Doc. 108-8 at 8. At the end of that same interview, he concluded by describing 1AP's activities—including the protection of election fraud proponents Flynn, Sidney Powell, and Patrick Bryne—and

25

instructing listeners on how to "join our group." Id. at 48-49. Likewise, on Patriot Transition Voice, he intertwined discussion of the election's illegitimacy with promotion of 1AP's activities. Doc. 109-2 at 7-13.

Given his primacy in the organization, Lewis had governing control of 1AP and spoke on its behalf when he publicly inserted himself in debate surrounding the 2020 election. He can be "regarded as the corporation itself" in these circumstances, and his actions should be considered those of 1AP. N. Assur. Co., 125 A. at 188. Other courts have found that when a corporation's officers speak publicly about a particular public controversy, those statements provide evidence that the corporation "thrust itself" into the public controversy. See e.g. Trump Media & Tech. Grp. Corp. v. WP Co. LLC, 720 F. Supp. 3d 1203, 1209 (M.D.Fl. 2024) ("[B]y virtue of CEO Devin Nune's public statements concerning the [public controversy], TMTG [the corporation] thrust itself into a public controversy" and is "a limited purpose public figure"); Nat'l Life Ins. Co. v. Phillips Pub., Inc., 793 F. Supp. 627, 638-39 (D.Md. 1992) (finding that plaintiff corporation "made extensive efforts to voluntarily inject itself into the vortex of public opinion," when, among other things, "corporate executives defended and gave assurances in numerous articles" about the public controversy); World Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d 1132, 1137 (10th Cir. 2006) (corporation had "extensive" participation in the public controversy where its

"principals have given dozens of interviews to media" about the controversy).

Here, likewise, by virtue of his status as founder and executive chairman of

1AP, Lewis's statements on behalf of the corporation about the legitimacy of

the 2020 presidential election thrust 1AP into the public controversy.

To bolster his argument that 1AP involved itself in the public

controversy, Abramson additionally highlights the fact that 1AP's Twitter

account had about 40,000 followers between November 2020 and January

2021, Doc. 108-1 at 6, and points to several tweets which the account posted

claiming the election was fraudulent. Doc. 108-13 at 1-19. In total, Abramson

has submitted eighteen tweets that 1AP posted about the election; of these,

the tweet with the highest level of interaction garnered 575 likes. Id. at 17.

While these tweets, on their own, could not prove 1AP thrust itself into the

public controversy, they do add support for Abramson's claim that 1AP

should be considered a limited-purpose public figure. Together, Lewis's

statements on behalf of 1AP and 1AP's own social media posts make clear

that it voluntarily injected itself into the controversy. Accordingly, 1AP, like

Lewis, should be considered a limited-purpose public figure with regard to

the debate surrounding the 2020 presidential election's legitimacy.

### c.    Philip Luelsdorff

Abramson's efforts to show Luelsdorff thrust himself into the public

controversy are less convincing. He argues that two sets of actions prove

27

Luelsdorff "voluntarily inject[ed] himself," Gertz, 418 U.S. at 351, into the controversy over the 2020 presidential election: his tweets and his activities as a member of 1AP.

Abramson introduces four of Luelsdorff's tweets about the legitimacy of the 2020 election to show he thrust himself into the debate, but none appear to have reached a significant audience. Docs. 108-26 through 108-29. In fact, the four screenshots Abramson has submitted of the tweets suggest that none received a single like, comment, or retweet. Id.

These tweets are not enough, on their own, to establish that Luelsdorff "thrust [himself] to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved," Gertz, 418 U.S. at 345. Faced with similar facts, another court "decline[d] to find that an otherwise private individual who makes statements on Twitter could thereby eliminate the heightened protections the law affords his or her reputation" and rejected an argument that plaintiff thrust himself into a controversy through tweets alone. Flynn v. Cable News Network, Inc., 2021 WL 6290046, at *11 (S.D.N.Y. Oct. 22, 2021), rejected in part on other grounds by 2021 WL 5964129 (S.D.N.Y. Dec. 16, 2021). Moreover, even when courts consider a plaintiff's social media activity as a factor weighing towards limited-purpose public figure status, that social media activity is typically accompanied by other efforts by the plaintiff to insert itself into the debate. See generally

28

Zachary R. Cormier, The News Media Engagement Principle: Why Social Media Has Not Actually Overrun the Limited Purpose Public Figure Category, 78 U. MIA. L. REV. 64, 95-96 & n. 223 (2023) (collecting cases showing that "in cases where social media activity was a factor in the court's holding that a plaintiff qualified as a limited purpose public figure, the plaintiff had, in the vast majority of cases, also engaged with news media about the controversy"). And, in the few cases where courts have determined that a plaintiff's social media activity alone was enough to show it had become sufficiently involved in the controversy to impact the outcome, the plaintiff's online posts garnered significantly more public attention than Luelsdorff's tweets at issue here. See, e.g., Broughty v. Bouzy, 2023 WL 5013654, at *5 (D.N.J. Aug. 7, 2023) (plaintiff was a limited-purpose public figure where he created a video about the controversy that was viewed 27 million times). Thus, Luelsdorff's participation—through his tweets—in the national debate surrounding efforts to challenge the 2020 election is insufficient on its own to confer limited-purpose public figure status upon him.

Abramson also cannot show that Luelsdorff's actions as a member of 1AP indicate that he voluntarily injected himself into the public controversy. Abramson argues that by providing security services to individuals who were attempting to undermine the election certification process and being present

in the Willard room, Luelsdorff sought to influence the outcome of the controversy surrounding the 2020 election. See Gertz, 418 U.S. at 345. However, there is no evidence that Luelsdorff, simply by virtue of providing security to those involved in challenging the election, "sought to influence public opinion" about the legitimacy of the 2020 election. Franchini, 109 F.4th at 33 (citation modified). Nor does his presence in the Willard room, which Luelsdorff contends was fleeting, show his involvement in the controversy. Luelsdorff thus must be considered a private individual for the purposes of his remaining defamation claim.

## B.   **Actual Malice**

Because I determine that Lewis and 1AP are a limited-purpose public figures, they must prove that Abramson published Statements 4, 5, 6, 25, 34, and 37 with actual malice—that is, "knowledge of the statement's falsity or reckless disregard for its truth." Lemelson v. Bloomberg L.P., 903 F.3d 19, 23 (1st Cir. 2018) (citing N.Y. Times, 376 U.S. at 279-80).

"The standard of actual malice is a daunting one." Howard v. Antilla, 294 F.3d 244, 252 (1st Cir. 2002) (quoting McFarlane v. Esquire Mag., 74 F.3d 1296, 1308 (D.C. Cir. 1996)). It is a "wholly subjective" standard. Levesque, 560 F.3d at 90. To satisfy it, "a plaintiff must point to 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication' or 'actually had a high

30

degree of awareness of . . . probable falsity.'" Lemelson, 903 F.3d at 24 (citations omitted) (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968); and then Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688 (1989)).

As noted above, actual malice must be proved by clear and convincing evidence. Levesque, 560 F.3d at 87. This test "calls for the plaintiff to prove more than would be necessary under the preponderance of the evidence standard but something less than what the beyond a reasonable doubt standard requires." Bose Corp. v. Consumers Union of U.S., Inc., 692 F.2d 189, 195 (1st Cir. 1998), aff'd, 466 U.S. 485 (1984). To survive summary judgment here, the plaintiffs must present evidence to support a reasonable jury finding that they have shown actual malice by clear and convincing evidence. See Anderson, 477 U.S. at 255-56.

In evaluating a defendant's subjective beliefs, "[a] court typically will infer actual malice from objective facts." Bose, 692 F.2d at 196. Courts may find actual malice "where a publisher fabricates an account, makes inherently improbable allegations, relies on a source where there is an obvious reason to doubt its veracity, or deliberately ignores evidence that calls into question his published statements." Levesque, 560 F.3d at 90. Although failure to investigate before publishing is usually insufficient by itself to show actual malice, "recklessness may be found where there are

31

obvious reasons to doubt the veracity of the informant or the accuracy of his reports." St. Amant, 390 U.S. at 732. And while "[a] defendant's motive to harm the plaintiff, such as evil intent, ill will, or spite, standing alone, is not sufficient to prove actual malice," de Laire v. Voris, 2023 DNH 095, 738 F. Supp. 3d 123, 140 (D.N.H. 2023), "it is a highly relevant consideration," Sindi v. El-Moslimany, 896 F.3d 1, 16 (1st Cir. 2018).

In their efforts prove actual malice here, the plaintiffs argue that a jury could conclude by clear and convincing evidence that Abramson had actual knowledge of the actionable statements' falsity, knowingly or recklessly misstated information through those statements, and purposefully avoided the truth.

On knowledge of actual falsity, the plaintiffs contend that "a reasonable jury could conclude that Abramson had actual knowledge of falsity because, despite practicing 'curatorial journalism,' he published statements that were not supported by any of the numerous sources he undeniably reviewed and relied upon before publication." Doc. 113 at 21. However, the plaintiffs do not identify any information suggesting that Abramson "entertained serious doubts as to the truth of" his statements. St. Amant, 390 U.S. at 731. Moreover, "[a]ctual-malice buzzwords, such as that the defendant had 'knowledge' that its statements were 'false' or had 'serious doubts' about their truth . . . are merely legal conclusions, which must be backed by well-pled

32

facts to be sufficient." Franchini, 109 F.4th at 35 (citation modified). Here, where the plaintiffs' allegations of knowing falsity are not supported by evidentiary proof, they are insufficient to prove Abramson's actual malice.

The plaintiffs add that Abramson "knowingly or recklessly misstated information" to defame the plaintiffs and "invented facts without any support to fit his predetermined narrative about Plaintiffs." Doc. 113 at 22. However, beyond stating that Abramson published statements that were "not supported by the supporting materials he compiled" and, on occasion, "flat out fabricated facts for which he had absolutely no supporting evidence," the plaintiffs introduce no evidence to support these allegations. Id. Nor do they show how Abramson was "deliberate[ly] and conscious[ly]" dishonest in the presentation of his facts, as the plaintiffs contend. Id. Without more, I cannot conclude that the plaintiffs' recitation of more "actual-malice buzzwords" is enough to raise a triable issue as to Abramson's actual malice. Franchini, 109 F.4th at 35.

Finally, the plaintiffs argue that a jury could find by clear and convincing evidence that Abramson "purposefully avoided the truth." Doc. 113 at 23. Citing Masson v. New Yorker Magazine, Inc., 960 F.2d 896, 901 (9th Cir. 1992), they argue that when the defendant "undertakes to investigate the accuracy of a story [which Abramson did] and learns facts casting doubt on the information contained therein [which he also did], [they]

33

may not ignore those doubts." Doc. 113 at 23 (alterations in original) (quoting

id.). While the plaintiffs are correct that a defendant may not ignore facts

that cast doubt on the accuracy of his story, they do not identify any evidence

showing that Abramson was given reason to doubt the accuracy of his

published statements. In the absence of such evidence, I do not believe that a

reasonable jury could conclude by clear and convincing evidence that

Abramson purposefully avoided the truth.

The plaintiffs argue that the evidence above, when considered

collectively, could lead a reasonable jury to conclude by clear and convincing

evidence that Abramson acted with actual malice. However, beyond a

recitation of legal jargon and "actual-malice buzzwords," Franchini, 109 F.4th

at 35, the plaintiffs have failed to adduce any evidence, circumstantial or

otherwise, that Abramson knew the statements were false, knowingly or

recklessly distorted information in his presentation of the statements, or

purposefully avoided the truth. See Levesque, 560 F.3d at 90. As such, I

grant Abramson's motion for summary judgment as to actual malice in

publishing the statements that allegedly defame Lewis and 1AP.

## C.    The Remaining Claim

Having granted Abramson's motion for summary judgment as to Lewis

and 1AP, I am left with Statement 38, which is the only statement that

allegedly defames Luelsdorff. Abramson argues he is entitled to summary

judgment with respect to this statement even if Luelsdorff is a private figure because the statement addresses a matter of public concern, which Abramson contends requires proof of actual malice. This argument is a misunderstanding of the relevant law.

It is true that "a private individual who seeks damages for a defamatory statement involving a matter of public concern cannot recover presumed or punitive damages absent a showing of actual malice." Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 128 (1st Cir. 1997) (emphasis added) (citing Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 751, 756-57 (1985)). Here, however, where the plaintiffs do not seek to recover presumed or punitive damages, they need not show actual malice simply because the actionable statements relate to matters of public concern.

Abramson nevertheless maintains that New Hampshire law provides additional protection for statements on matters of public concern. Doc. 108-1 at 17-19 (citing MacDonald v. Jacobs, 171 N.H. 668 (2019)). However, MacDonald does not so hold. There, the court only applied First Amendment law and determined that actual malice was required by a private figure plaintiff only when seeking enhanced compensatory damages on speech involving matters of public concern. MacDonald, 171 N.H. at 676. It did not purport to conduct a state law analysis, nor did it hold that actual malice

must be shown in all cases involving speech of public concern. See also

Touma v. St. Mary's Bank, 142 N.H. 762, 766 (1998) ("In Gertz [sic], the

Supreme Court held that that presumed damages were not available absent

'a showing of knowledge of falsity or reckless disregard for the truth,' where

the defamation action was brought by a private individual regarding a matter

of public concern.") (emphasis added) (citing Gertz, 418 U.S. at 349).

Instead, because Luelsdorff is a private individual, his claim is subject

to the ordinary standard that applies to defamation claims in New

Hampshire. See Thomas, 155 N.H. at 321; see also Gertz, 418 U.S. at 347

("[S]o long as they do not impose liability without fault, the States may define

for themselves the appropriate standard of liability for a publisher or

broadcaster of defamatory falsehood injurious to a private individual.").

Abramson's summary judgment arguments are premised on his

contention that the plaintiffs must prove that he acted with actual malice. He

does not make any argument that summary judgment is warranted under the

traditional standard for proving defamation under New Hampshire law.

Thus, because I have determined that Luelsdorff, as private individual, is

subject to the traditional standard for defamation, and Abramson has failed

to make any argument under that standard, Luelsdorff's claim survives to

the extent it is premised on Statement 38.

36

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Abramson's motion for summary judgment, Doc. 108, is granted in part and denied in part. Because Lewis and 1AP are limited-purpose public figures and the plaintiffs have not raised triable issues of fact as to Abramson's actual malice, I grant Abramson's motion as to Lewis and 1AP's defamation claims. However, because Luelsdorff is not a limited-purpose public figure, he may proceed on his defamation claim to the extent it is premised on Statement 38.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

July 22, 2026

cc:    Counsel of Record

37